Kevin H. Marino
John A. Boyle
**MARINO, TORTORELLA & BOYLE, P.C.**
437 Southern Boulevard
Chatham, New Jersey 07928-1488
(973) 824-9300

OF COUNSEL:
Michael B. Carlinsky[*]
Kevin S. Reed[*]
Kimberly Carson[*]
**QUINN EMANUEL URQUHART**
 **& SULLIVAN, LLP**
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| AMERICAN INTERNATIONAL GROUP, INC., AIG PC GLOBAL SERVICES, INC., NATIONAL UNION FIRE INSURANCE CO. OF PITTSBURGH PA, AIG SPECIALTY INSURANCE COMPANY, BLACKBOARD SPECIALTY INSURANCE COMPANY, LEXINGTON INSURANCE COMPANY, TUDOR INSURANCE COMPANY, and WESTERN WORLD INSURANCE COMPANY,<br><br>        Plaintiffs,<br><br>  -against-<br><br>DELLWOOD INSURANCE GROUP, LLC, THOMAS CONNOLLY, KEAN DRISCOLL, and MICHAEL PRICE,<br><br>        Defendants. | Case No. _____<br><br><br>**COMPLAINT**<br><br>**(JURY TRIAL DEMANDED)** |

---

[*] Application for admission *pro hac vice* forthcoming.

1

Plaintiffs, American International Group, Inc. ("AIG Parent"), AIG PC Global Services, Inc. ("AIG PC Global"), National Union Fire Insurance Co. of Pittsburgh PA ("National Union"), AIG Specialty Insurance Company ("AIG Specialty Insurance"), Blackboard Specialty Insurance Company ("Blackboard Specialty Insurance"), Lexington Insurance Company ("Lexington"), Tudor Insurance Company ("Tudor"), and Western World Insurance Company ("Western World" and, together with AIG Specialty Insurance, Blackboard Specialty Insurance, Lexington, and Tudor, the "AIG E&S Insurers," and together with all other Plaintiffs, "AIG"), by and through their undersigned attorneys, bring this Complaint against Defendants, Dellwood Insurance Group, LLC ("Dellwood"), Thomas Connolly ("Connolly"), Kean Driscoll ("Driscoll"), and Michael Price ("Price" and, together with Connolly and Driscoll, the "Individual Defendants," and together with Dellwood, "Defendants"), for injunctive relief and damages. In support thereof, AIG states as follows:

## PRELIMINARY STATEMENT

1.    AIG, together with its affiliated companies, is a leading international insurance and financial services organization. AIG files this action against a group of its former senior executives (the Individual Defendants) and their newly-launched competitor insurance company (Dellwood) to halt Defendants' unlawful misappropriation of AIG's trade secrets and confidential information (the

"Confidential Information"), breaches of contract, breaches of fiduciary duty, unfair competition, and violation of the Computer Fraud and Abuse Act.

2.    AIG, through the business of the AIG E&S Insurers, has been a market leader in Excess and Surplus Lines ("E&S") insurance for more than half a century. E&S insurance is a type of insurance coverage that specifically covers businesses with high risk or adverse loss histories that the traditional insurance market will not cover.  Since 2018, AIG's E&S business has experienced explosive growth.  This was not a random happenstance but rather a direct result of AIG's intellectual labor and significant investments.

3.    Price and Driscoll are former AIG executives who recently departed from AIG, with effective separation dates of June 30, 2023 and March 3, 2024, respectively.  They each held senior roles at AIG and were involved in AIG's E&S business.  Price served as AIG's Chief Executive Officer ("CEO") of North America General Insurance, while Driscoll served as AIG's Global Chief Underwriting Officer ("CUO") of General Insurance.

4.    Price and Driscoll are parties to agreements with AIG that impose upon them post-employment contractual obligations.  Price and Driscoll each received significant consideration for entering into these agreements, including valuable long-term incentive ("LTI") plan awards from AIG.

5.      Price's restrictive covenants include prohibitions against competing with AIG (through September 30, 2023), interfering with AIG's customer relationships (through September 30, 2023), soliciting AIG's employees (through June 30, 2024), soliciting AIG's customers where doing so would require use or disclosure of AIG's Confidential Information (does not expire), disclosing AIG's Confidential Information (does not expire), and disparaging AIG (does not expire).

6.      Driscoll's restrictive covenants include a garden leave provision (through March 3, 2024) and prohibitions against competing with AIG or violating his fiduciary duty of loyalty (through March 3, 2024), soliciting AIG's employees (through March 3, 2024), soliciting AIG's customers where doing so would require use or disclosure of AIG's Confidential Information (does not expire), disclosing AIG's Confidential Information (does not expire), and disparaging AIG (does not expire).

7.      On March 7, 2024, only four days after Driscoll's garden leave and non-compete expired, Price and Driscoll publicly announced the formation of Dellwood as a competitor to AIG in the field of E&S insurance.

8.      According to Dellwood's website, Price serves as Dellwood's CEO, while Driscoll serves as its President and CUO.  These are the same roles they held at AIG.

9.     On information and belief, Price and Driscoll breached their obligations to AIG long before their non-competes expired.  Indeed, Dellwood's own publicly-filed documents reveal that the Dellwood legal entity was formed in Delaware no later than December 28, 2023, and registered to do business in New Jersey no later than January 30, 2024.

10.     Moreover, by March 7, 2024, Price and Driscoll had already raised more than $250 million in seed capital from various investors.  Indeed, in a press release issued that day, Dellwood announced: "Dellwood is backed by blue-chip companies including RenaissanceRe, PartnerRe, Starr Insurance, and Central Insurance, as well as prominent individual investors including Dominic Addesso, David Delaney, VJ Dowling, Jim Hays, and principals from Stone Point Capital." On information and belief, Price and Driscoll raised $250 million in capital by actively marketing Dellwood to these insurance investors, and thereby competing against AIG, at a time when one or both of them was contractually obligated not to do so.

11.     By March 7, 2024, Price and Driscoll had also already engaged Howden Tiger Capital Markets & Advisory as Dellwood's financial advisor and engaged Foley & Lardner as Dellwood's legal advisor.

12.     In addition, by March 7, 2024, Price and Driscoll had hired multiple former AIG employees who worked with them in AIG's E&S group.  AIG has reason

to believe that Price, Driscoll, and Dellwood are not simply looking for competent employees from AIG to join them at Dellwood, but rather are seeking out the AIG Confidential Information that their former colleagues possess.

13.   Plainly, Price and Driscoll were in the market competing against AIG well prior to the March 3, 2024 expiration of Driscoll's garden leave and non-compete obligations and likely before the September 30, 2023 expiration of Price's non-compete obligation.

14.   Further, although Price and Driscoll both agreed to refrain from soliciting AIG employees for one year after the termination of their employment with AIG (a restriction Price remains subject to through June 30, 2024), they both violated this agreement by soliciting recent AIG executive Connolly.  Worse, Price and Driscoll convinced Connolly to work for Dellwood as a secret agent during at least his final month at AIG, which concluded March 15, 2024.

15.   Like Price and Driscoll, Connolly held a senior role at AIG.  He was Chief Financial Officer ("CFO") of North America General Insurance.  Connolly now works alongside Price and Driscoll, and on information and belief holds the title of Dellwood's CFO.

16.   AIG has discovered documentary evidence that Connolly—while *still* employed by AIG—performed work for Dellwood, forwarded AIG's Confidential

Information to his personal email address for use at Dellwood, and solicited AIG co-workers to join him at Dellwood.

17.     As senior AIG executives, the Individual Defendants had access to Confidential Information that is proprietary to AIG regarding virtually every aspect of AIG's North America General Insurance business, including strategy, finance, accounting, and underwriting.   On information and belief, Defendants are using AIG's Confidential Information to conduct Dellwood business, including to compete against AIG; to solicit business from, and transact business with, AIG's current and prospective customers; and to solicit AIG's employees to depart AIG and join Dellwood, all in violation of their contractual obligations to AIG.

18.     Defendants must be held accountable for violating their obligations to AIG, and their unlawful conduct must cease.   Accordingly, and in order to protect its Confidential Information and employee and customer goodwill, AIG seeks injunctive relief and damages for Defendants' misappropriation of AIG's Confidential Information, breaches of contract, breaches of fiduciary duty, unfair competition, and violation of the Computer Fraud and Abuse Act.

## THE PARTIES

## (L. Civ. R. 10.1 STATEMENT)

19.     Plaintiff AIG Parent heads a leading global insurance organization, providing insurance solutions that help businesses and individuals in approximately

190 countries and jurisdictions. AIG Parent is a Delaware corporation with its principal place of business at 1271 Avenue of the Americas, New York, New York 10020.

20.    Plaintiff AIG PC Global is a U.S.-based subsidiary of AIG Parent. AIG PC Global is a Delaware corporation with its principal place of business at 1271 Avenue of the Americas, New York, New York 10020.

21.    Plaintiff National Union is a U.S.-based subsidiary of AIG Parent. National Union is a Pennsylvania corporation with its principal place of business at 1271 Avenue of the Americas, New York, New York 10020.

22.    Plaintiff AIG Specialty Insurance is a U.S.-based subsidiary of AIG Parent. AIG Specialty Insurance is an Illinois corporation with its principal place of business at 500 West Madison Street, Suite 3000, Chicago, Illinois 60661.

23.    Plaintiff Blackboard Specialty Insurance is a U.S.-based subsidiary of AIG Parent. Blackboard Specialty Insurance is a Delaware corporation with its principal place of business at 1271 Avenue of the Americas, New York, New York 10020.

24.    Plaintiff Lexington is a U.S.-based subsidiary of AIG Parent. Lexington is a Delaware corporation with its principal place of business at 99 High Street, Boston, Massachusetts 02110.

25.     Plaintiff Tudor is a U.S.-based subsidiary of AIG Parent.  Tudor is a New Hampshire corporation with its principal place of business at 300 Kimball Drive, Suite 500, Parsippany, New Jersey 07054.

26.     Plaintiff Western World is a U.S.-based subsidiary of AIG Parent. Western World is a New Hampshire company with its principal place of business at 300 Kimball Drive, Suite 500, Parsippany, New Jersey 07054.

27.     Defendant Dellwood is a Delaware limited liability company. Dellwood's address is unknown at this time.  On information and belief, Dellwood maintains its principal place of business in New Jersey.  Dellwood is licensed to do business in New Jersey.

28.     Defendant Price is a citizen of New Jersey, residing at 6 Rutgers Court, Westfield, New Jersey 07090.  At AIG, Price was employed by National Union and served as CEO of AIG's North America General Insurance business, which included providing services to each of the AIG E&S Insurers.  Price is now employed by Dellwood as CEO.

29.     Defendant Driscoll is a citizen of New Jersey, residing at 159 Garfield Avenue, Madison, New Jersey 07940.  At AIG, Driscoll was employed by National Union and served as Global CUO of AIG's General Insurance business, which included providing services to each of the AIG E&S Insurers.  Driscoll is now employed by Dellwood as President and CUO.

30.     Defendant Connolly is a citizen of New York, residing at 200 North End Avenue, Apartment 9G, New York, NY 10282.  At AIG, Connolly was employed by AIG PC Global and served as CFO of AIG's North America General Insurance, which included providing services to each of the AIG E&S Insurers.  Connolly is now employed by Dellwood and upon information and belief he holds the title of Dellwood CFO.

## JURISDICTION AND VENUE

31.     The Court has subject-matter jurisdiction over AIG's First, Second, and Eighth Causes of Action pursuant to 28 U.S.C. § 1331 because they raise federal questions under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*  The Court has supplemental jurisdiction over AIG's Third, Fourth, Fifth, Sixth, and Seventh Causes of Action pursuant to 28 U.S.C. § 1367(a) because they "are so related to claims in the action within [the Court's] original jurisdiction that they form part of the same case or controversy[.]"

32.     This Court has personal jurisdiction over Price and Driscoll because they are each residents of New Jersey.  This Court has personal jurisdiction over Dellwood because it is licensed to do business in New Jersey and, on information and belief, maintains its principal place of business in New Jersey.  This Court has general personal jurisdiction over Connolly because of his systematic and

continuous contacts with the State of New Jersey, as Connolly works for New Jersey-based Dellwood, and, on information and belief, maintains an office in New Jersey.  This Court also has specific personal jurisdiction over Connolly because Connolly availed himself of the privilege of conducting activities within the forum by taking employment here and acting in concert with New Jersey residents to injure AIG in breach of his contractual and other legal obligations to AIG.

33.     Venue is appropriate in the District of New Jersey pursuant to 28 U.S.C. § 1391(b) because: (i) the State of New Jersey is where a substantial portion of the facts giving rise to the causes of action set forth in this Complaint occurred; (ii) Dellwood's principal place of business is in New Jersey; (iii) Dellwood is registered to do business in New Jersey; (iv) Price and Driscoll presently reside in New Jersey, and resided in New Jersey during their employment with AIG; and (v) two of the AIG E&S Insurers (Western World and Tudor) have their principal place of business in New Jersey.

## **FACTUAL BACKGROUND**

### A.    **AIG's Insurance Business**

34.     AIG, together with its affiliated companies, is a leading international insurance and financial services organization, with operations in approximately 190 countries and jurisdictions throughout the world.  AIG's member companies serve commercial, institutional, and individual customers through the most extensive

worldwide insurance network of any insurer.  AIG's commercial and individual clients include corporations and businesses of every type and size, other insurance companies, professional organizations, independent agents and brokers, governments, and other entities.

35.     Among the services AIG offers is E&S insurance, through its subsidiaries, the AIG E&S Insurers.  E&S insurance is a type of insurance coverage that specifically covers businesses with high risk or adverse loss histories.  E&S insurance underwrites coverage for, among other things, commercial property and casualty lines, marine, financial lines, and homeowners, when standard insurers will not.

36.     AIG has been a market leader in E&S insurance for more than half a century.  Since 2018, AIG's E&S business has experienced explosive growth.  That did not happen by accident, but as a direct result of AIG's intellectual labor and significant investments.

**B.     The Individual Defendants' Roles at AIG**

37.     The Individual Defendants were all senior, equity-holding executives who had significant authority and responsibilities at AIG.

38.     AIG hired Price as Deputy CUO of North America General Insurance in November 2018.  In August 2020, Price was promoted to the position of CEO of North America General Insurance.  He remained in this CEO position until his

separation from AIG, which became effective June 30, 2023.  While Price was employed by National Union, his role involved providing services to each of the AIG E&S Insurers.  As CEO, Price's responsibilities included managing the high level affairs of AIG's North America General Insurance business, developing long-term corporate strategy, and overseeing business operations.  As a senior executive, Price was privy to AIG's Confidential Information.  Additionally, Price's status as a senior executive afforded him the opportunity to receive considerable equity in AIG, becoming a part-owner of AIG through the execution of various equity-award agreements.  Price was among the most highly compensated employees at AIG during his time there.  Between 2021 and 2023 alone, Price received total compensation of roughly $14,162,418 from AIG.

39.     AIG hired Driscoll as Global CUO of General Insurance in July 2019. He remained in this CUO position until his resignation from AIG on March 3, 2023, which became effective March 3, 2024, following twelve months of paid garden leave.  While Driscoll was employed by National Union, his role involved providing services to each of the AIG E&S Insurers.  As Global CUO for AIG's General Insurance business, Driscoll's responsibilities included maintaining underwriting standards and promoting underwriting strategy.  As a senior executive, Driscoll was privy to AIG's Confidential Information.  Like Price, Driscoll was provided partial ownership of AIG through various equity-award agreements.  Driscoll was also

among the most highly compensated employees at AIG during his last two years there.  Between 2021 and 2023, Driscoll received total compensation of roughly $18,200,633 from AIG.

40.    AIG hired Connolly in October 2019 as CFO of Global Travel, Warranty, and Multinational.  On March 2020, he was promoted to CFO of North America General Insurance.  Connolly remained in this CFO position until his separation from AIG, which became effective March 15, 2024.  While Connolly was employed by AIG PC Global, his role involved providing services to each of the AIG E&S Insurers.  As CFO, Connolly was responsible for managing the financial activities of AIG's North America General Insurance business, making investment decisions, and overseeing capital structure.  As a senior executive, Connolly was privy to AIG's Confidential Information.  Moreover, he was granted similar equity-rights to those of Price and Driscoll.  Connolly was also a highly compensated employee of AIG during his last two years there.  Between 2021 and 2023, Connolly received total compensation of roughly $2,564,829 from AIG.

41.    In their senior executive roles at AIG, each of the Individual Defendants had access to highly sensitive AIG Confidential Information, including knowledge and information on customers, prospects, business plans and strategies, distribution models, financial planning and analysis, and financial results. Each of the Individual Defendants also had access to AIG's human resources information, including

14

confidential employee information such as salaries, bonuses, equity awards, and performance reviews.

42.     For example, each of the Individual Defendants had access to AIG's internal business reviews, including business reviews for each of the AIG E&S Insurers.  These documents contained highly sensitive, proprietary, and confidential information regarding AIG's pricing, key initiatives, strategy, and performance and financial analyses.  These documents would give the Individual Defendants an unquestionable head start in launching a competitor to AIG.

## C.     The Individual Defendants' Restrictive Covenants

43.     AIG requires its top-level equity-holding executives such as the Individual Defendants to enter into agreements containing post-employment restrictive covenants that, among other things:  (i) prohibit the use and disclosure of Confidential Information outside of AIG; (ii) prohibit the solicitation of AIG customers where doing so would require the use or disclosure of Confidential Information; and (iii) prohibit the solicitation of AIG employees for a year after leaving AIG.  These covenants are narrowly tailored to protect AIG's legitimate business interests.  And with equity-holding executives such as the Individual Defendants, it is critical that, in return for the value of being a business owner and having access to AIG's assets, equity holders agree to—and actually honor—the

restrictive covenants that protect AIG's value and prevent its assets from being leveraged in service of a competing business.

44.    As part of their employment at AIG, the Individual Defendants entered into a number of LTI equity award agreements, employment agreements, and separation agreements whereby they agreed to certain post-employment restrictive covenants.

45.    Price's restrictive covenants include prohibitions against competing with AIG (through September 30, 2023), interfering with AIG's customer relationships (through September 30, 2023), soliciting AIG's employees (through June 30, 2024), disclosing AIG's Confidential Information (does not expire), soliciting AIG's customers where doing so would require use or disclosure of AIG's Confidential Information (does not expire), and disparaging AIG (does not expire).

46.    Driscoll's restrictive covenants include a garden leave provision (through March 3, 2024) and prohibitions against competing with AIG or violating his fiduciary duty of loyalty (through March 3, 2024), soliciting AIG's employees (through March 3, 2024), soliciting AIG's customers where doing so would require use or disclosure of AIG's Confidential Information (does not expire), disclosing AIG's Confidential Information (does not expire), and disparaging AIG (does not expire).

47.     Connolly's restrictive covenants include prohibitions against soliciting AIG's employees (through March 15, 2025), soliciting AIG's customers where doing so would require use or disclosure of AIG's Confidential Information (does not expire), disclosing AIG's Confidential Information (does not expire), and disparaging AIG (does not expire).

### The Individual Defendants' Employee Non-Solicitation Obligations

48.     The Individual Defendants each agreed to abide by the following employee non-solicitation obligation for one year after the termination of their employment with AIG:

> [Y]ou agree that … (ii) during your Employment with the Company and for a period of one (1) year after Employment Terminates for any reason, **you will not**, directly or indirectly, regardless of who initiates the communication, **solicit, participate in the solicitation or recruitment of, or in any manner encourage or provide assistance to any employee, consultant, registered representative, or agent** of the Company **to terminate his or her Employment** or other relationship with the Company or to leave its employ or other relationship with

the Company for any engagement in any capacity or any
other person or entity.[1]

49.     Based on the effective dates of their separation from AIG, Driscoll's

employee non-solicitation obligations ran through March 3, 2024; Price's employee

non-solicitation obligations run through June 30, 2024; and Connolly's employee

non-solicitation obligations run through March 15, 2025.

## The Individual Defendants' Customer Non-Solicitation Obligations

50.     The Individual Defendants each agreed to abide by the following

customer non-solicitation obligation, which is tied to the use and disclosure of

Confidential Information and therefore does not expire:

> [Y]ou agree that (i) during your Employment with the
> Company and any time thereafter, *you will not*, directly or
> indirectly, on your own behalf or on behalf of any other
> person or entity, *solicit, contact, call upon, communicate*

---

[1]   Driscoll LTI RSU Award Agreement (executed by Driscoll and AIG Parent on March 31, 2023) at 2-3 (emphasis added unless otherwise noted); Driscoll LTI Stock Options Award Agreement (executed by Driscoll and AIG Parent on March 31, 2023) at 2-3;  Driscoll LTI PSU Award Agreement (executed by Driscoll and AIG Parent on April 3, 2023) at 3; Price LTI PSU Award Agreement (executed by Price and AIG Parent on April 10, 2023) at 3; Price LTI RSU Award Agreement (executed by Price and AIG Parent on April 10, 2023) at 2-3; Price LTI Stock Option Award Agreement (executed by Price and AIG Parent on April 10, 2023) at 2-3; Connolly LTI RSU Award Agreement (executed by Connolly and AIG Parent on April 11, 2023) at 2-3; *see also* Price Offer Letter (executed by Price and AIG Parent on October 6, 2018 with similar language) at 4; Connolly Offer Letter (executed by Connolly and AIG Parent on September 24, 2019 with similar language) at 6; Price Separation Agreement and Release (executed by Price and AIG Parent on March 22, 2023 with similar language) at 4; Connolly Separation Agreement and Release (executed by Connolly and AIG PC Global Services on February 22, 2024 with similar language) at 4.

> **with or attempt to communicate with any customer or client or prospective customer or client** of the Company **where to do so would require the use or disclosure of confidential, proprietary and/or trade secret information**.[2]

### Price and Driscoll's Non-Competition Obligations

51.     Price and Driscoll each agreed to abide by certain non-competition provisions with AIG.

52.     Driscoll agreed to abide by the following garden leave, fiduciary duty of loyalty, and non-competition obligations for one year after notice of his resignation from AIG:

> Following the provision of a Notice of Termination by you that you are terminating your employment <u>without</u> Good Reason or <u>without</u> Validus Good Reason, the Company Group may direct, in its sole and exclusive discretion, that you perform no duties, exercise no powers and resign from

---

[2]   Driscoll LTI RSU Award Agreement (executed by Driscoll and AIG Parent on March 31, 2023) at 2-3 (emphases added unless otherwise noted); Driscoll LTI Stock Options Award Agreement (executed by Driscoll and AIG Parent on March 31, 2023) at 2; Driscoll LTI PSU Award Agreement (executed by Driscoll and AIG Parent on April 3, 2023) at 3; Price LTI PSU Award Agreement (executed by Price and AIG Parent on April 10, 2023) at 2; Price LTI RSU Award Agreement (executed by Price and AIG Parent on April 10, 2023) at 2; Price LTI Stock Option Award Agreement (executed by Price and AIG Parent on April 10, 2023) at 2; Connolly LTI RSU Award Agreement (executed by Connolly and AIG Parent on April 11, 2023) at 2; *see also* Price Offer Letter (executed by Price and AIG Parent on October 6, 2018 with similar language) at 4; Connolly Offer Letter (executed by Connolly and AIG Parent on September 24, 2019 with similar language) at 6; Price Separation Agreement and Release (executed by Price and AIG Parent on March 22, 2023 with similar language) at 4; Connolly Separation Agreement and Release (executed by Connolly and AIG PC Global Services on February 22, 2024 with similar language) at 4.

any office held in connection with your employment with the Company Group; provided, however, that, following any such direction, you will continue to be required to comply with your other obligations under this Agreement (**and will continue to have a duty of loyalty to the Company Group as an employee**) **for a period of twelve (12) months** following the date on which the Notice of Termination was provided to the Company Group (such period, the "Garden Leave Period"). During the Garden Leave Period (i) you will be entitled to receive payment of the Base Salary, benefits and reimbursement of expenses, (ii) you will continue to vest in all equity awards and be eligible for annual short term incentive awards and (iii) you will continue to be subject to the restrictive covenants set forth in Section 11 of this Agreement and the Non-Solicitation and Non- Disclosure Agreement.

[Y]ou hereby agree that at any time during your employment (including during the Garden Leave Period) and, if the Termination Date occurs as a result of termination due to Disability, by the Company Group with or without Cause or Validus Cause or by you for Good Reason or Validus Good Reason, thereafter for the Noncompetition Period, **you will not directly or indirectly own, manage, control, participate in, consult with, render services for or in any manner engage in any business competing with the businesses of the Company Group as such businesses exist or are in process or being planned as of the Termination Date**, within any geographical area in which the Company Group engage or plan to engage in such businesses.[3]

53.    Driscoll's garden leave, non-competition, and duty of loyalty obligations ran through March 3, 2024.

---

[3]   Driscoll Offer Letter (executed by Driscoll and AIG Parent on May 7, 2019) at 4-5 (emphasis added).

54.     Price agreed to abide by the following non-competition obligation

through September 30, 2023:

> During the period commencing on the Employee's Termination Date and ending on ***September 30, 2023***, the Employee shall not, directly or indirectly:
>
> (a) ***Engage in any "Competitive Business***" (defined below)[4] for the Employee's own account; (b) Enter the employ of, or render any services to, any person engaged in any Competitive Business; (c) Acquire a financial interest in, or otherwise become actively involved with, any person engaged in any Competitive Business, directly or indirectly, as an individual, partner, shareholder, officer, director, principal, agent, trustee or consultant; or (d) Interfere with business relationships between AIG and customers or suppliers of, or consultants to AIG.[5]

---

[4]  Price's non-competition provision defines "Competitive Business" as "any person or entity (including any joint venture, partnership, firm, corporation or limited liability company) that engages in or proposes to engage in the following activities in any geographical area in which AIG does such business: (a) The property and ***casualty insurance*** business, including commercial insurance, business insurance, personal insurance and specialty insurance; (b) The ***life and accident and health insurance*** business; (c) The ***underwriting, reinsurance, marketing or sale*** of (y) any form of insurance of any kind that AIG as of such date does, or proposes to, underwrite, reinsure, market or sell (any such form of insurance, an 'AIG Insurance Product'), or (z) any other form of insurance that is marketed or sold in competition with any AIG Insurance Product; (d) The ***investment and financial services business***, including retirement services and mutual fund or brokerage services; or (e) Any other business that as of such date is a ***direct and material competitor of one of AIG's businesses***." *See* Price Separation Agreement and Release (executed by Price and AIG Parent on March 22, 2023) at 5 (emphases added).

[5]  Price Separation Agreement and Release (executed by Price and AIG Parent on March 22, 2023) at 4-5 (emphases added).

## <ins>The Individual Defendants' Non-Disclosure Obligations</ins>

55.     The Individual Defendants each agreed to abide by the following non-disclosure and confidentiality obligations, which do not expire:

> Subject to and in addition to any confidentiality or non-disclosure requirements to which you were subject prior to the date you electronically consent to or execute this Award Agreement, during your Employment and any time thereafter, you agree that ***(i) all confidential, proprietary and/or trade secret information received, obtained or possessed at any time by you*** concerning or relating to the business, financial, operational, marketing, economic, accounting, tax or other affairs at the Company or any client, customer, agent or supplier or prospective client, customer, agent or supplier of the Company ***will be treated by you in the strictest confidence and will not be disclosed or used by you in any manner other than in connection with the discharge of your job responsibilities*** without the prior written consent of the Company or unless required by law, and (ii) ***you will not remove or destroy any confidential, proprietary and/or trade secret information and will return any such information in***

22

*your possession*, custody or control at the end of your Employment (or earlier if so requested by the Company).[6]

## **The Individual Defendants' Non-Disparagement Obligations**

56.     The Individual Defendants each agreed to abide by the following non-disparagement provision, which does not expire:

> **Non-Disparagement**. You agree that during and after your Employment with the Company, you will not make disparaging comments about AIG or any of its subsidiaries or affiliates or any of their officers, directors or employees to any person or entity not affiliated with the Company. Nothing in this Award Agreement or any other agreement with the Company shall prevent you from making or publishing any statement (a) when required by law, subpoena or court order, or at the request of an administrative agency or legislature (b) in the course of any legal, arbitral. administrative, legislative or regulatory proceeding, (c) to any governmental authority, regulatory agency or self-regulatory organization, (d) in connection with any investigation by the Company, or (e) where a

---

[6]   Driscoll LTI RSU Award Agreement (executed by Driscoll and AIG Parent on March 31, 2023) at 2-3 (emphasis added unless otherwise noted); Driscoll LTI Stock Options Award Agreement (executed by Driscoll and AIG Parent on March 31, 2023) at 3; Driscoll LTI PSU Award Agreement (executed by Driscoll and AIG Parent on April 3, 2023) at 2; Price LTI PSU Award Agreement (executed by Price and AIG Parent on April 10, 2023) at 3; Price LTI RSU Award Agreement (executed by Price and AIG Parent on April 10, 2023) at 2-3; Price LTI Stock Option Award Agreement (executed by Price and AIG Parent on April 10, 2023) at 2; Connolly LTI RSU Award Agreement (executed by Connolly and AIG Parent on April 11, 2023) at 2-3; *see also* Price Offer Letter (executed by Price and AIG Parent on October 6, 2018 with similar language) at 4; Connolly Offer Letter (executed by Connolly and AIG Parent on September 24, 2019 with similar language) at 6-8; Price Separation Agreement and Release (executed by Price and AIG Parent on March 22, 2023 with similar language) at 2-4; Connolly Separation Agreement (executed by Connolly and AIG PC Global Services on February 22, 2024 with similar language) at 2-4.

prohibition or limitation on such communication is unlawful. For example, nothing in this Award Agreement or any other agreement shall prohibit, prevent, limit or restrict you from (i) exercising your Section 7 rights under the National Labor Relations Act, including, but not limited to, the right to participate in activities or communications related to wages or compensation or other terms, conditions or privileges of employment, or (ii) disclosing information about unlawful acts in the workplace, including, but not limited to, sexual harrassment [sic].[7]

## **The Individual Defendants' Obligations to Return Information**

57.     The Individual Defendants each agreed to abide by the following

return-of-information obligation, which does not expire:

[D]uring your Employment and any time thereafter, you agree that . . . you will . . . return any [confidential, proprietary and/or trade secret] information in your

---

[7]   Driscoll LTI RSU Award Agreement (executed by Driscoll and AIG Parent on March 31, 2023) at 3 (emphasis added unless otherwise noted); Driscoll LTI Stock Options Award Agreement (executed by Driscoll and AIG Parent on March 31, 2023) at 3; Driscoll LTI PSU Award Agreement (executed by Driscoll and AIG Parent on April 3, 2023) at 3; Price LTI PSU Award Agreement (executed by Price and AIG Parent on April 10, 2023) at 3; Price LTI RSU Award Agreement (executed by Price and AIG Parent on April 10, 2023) at 3; Price LTI Stock Option Award Agreement (executed by Price and AIG Parent on April 10, 2023) at 3; Connolly LTI RSU Award Agreement (executed by Connolly and AIG Parent on April 11, 2023) at 3; *see also* Price Offer Letter (executed by Price and AIG Parent on October 6, 2018 with similar language) at 5; Connolly Offer Letter (executed by Connolly and AIG Parent on September 24, 2019 with similar language) at 6-7; Price Separation Agreement and Release (executed by Price and AIG Parent on March 22, 2023 with similar language) at 5;  Connolly Separation Agreement (executed by Connolly and AIG PC Global Services on February 22, 2024 with similar language) at 4.

possession, custody or control at the end of your Employment (or earlier if so requested by the Company).[8]

58.     Furthermore, the Individual Defendants were each subject to the following return-of-information obligation set forth in AIG's Employee Handbook, in a provision titled "Leaving the Company:"

> After you leave the Company, you may not use any property or disclose any proprietary information/trade secrets/confidential information that you had access to, or obtained as a result of, being employed by AIG or any of its subsidiaries. This information would include, but is not limited to, business plans, customer information, vendor information, pricing information, competitive data, and employee information.   In all cases of employment separation, Company property must be returned to your manager on or before your last day, unless another arrangement is approved by management. Company property includes, but is not limited to: manuals and other information, computers and related equipment, smartphones, tablet computers, tools, keys, badges, credit cards, motor vehicles and all other items that are considered Company property.

---

[8]   Connolly Offer Letter (executed by Connolly and AIG Parent on September 24, 2019) at 6-7; *see also* Price Offer Letter (executed by Price and AIG Parent on October 6, 2018 with similar language) at 4-5;  Driscoll LTI RSU Award Agreement (executed by Driscoll and AIG Parent on March 31, 2023 with similar language) at 2; Driscoll LTI Stock Options Award Agreement (executed by Driscoll and AIG Parent on March 31, 2023 with similar language) at 2; Driscoll LTI PSU Award Agreement (executed by Driscoll and AIG Parent on April 3, 2023 with similar language) at 2; Price LTI PSU Award Agreement (executed by Price and AIG Parent on April 10, 2023) at 2; Price LTI RSU Award Agreement (executed by Price and AIG Parent on April 10, 2023 with similar language) at 2; Price LTI Stock Option Award Agreement (executed by Price and AIG Parent on April 10, 2023 with similar language) at 2; Connolly LTI RSU Award Agreement (executed by Connolly and AIG Parent on April 11, 2023 with similar language) at 2.

## The Individual Defendants' Choice Of Law Provisions

59.     All of the relevant agreements between the Individual Defendants and AIG contain New York choice-of-law provisions except Driscoll's offer letter (dated May 7, 2019), which is silent on the issue.[9]

## Connolly and Price's Acknowledgements That Restrictions Are Reasonable

60.     In their offer letters, Connolly and Price each acknowledged that (a) AIG's restrictive covenants are "reasonably necessary for the protection of AIG;" (b) "irreparable harm and damages would result to AIG if [AIG's restrictive covenants were not complied with];" and (c) "AIG shall be entitled to legal, equitable, or other remedies, including, without limitation, injunctive relief and specific performance to protect against the inevitable disclosure of AIG's

---

[9]   Price Offer Letter (executed by Price and AIG Parent on October 6, 2018) at 7; Connolly Offer Letter (executed by Connolly and AIG Parent on September 24, 2019) at 8; Price Separation Agreement and Release (executed by Price and AIG Parent on March 22, 2023) at 10; Driscoll LTI RSU Award Agreement (executed by Driscoll and AIG Parent on March 31, 2023) at 4; Driscoll LTI Stock Options Award Agreement (executed by Driscoll and AIG Parent on March 31, 2023) at 4;  Driscoll LTI PSU Award Agreement (executed by Driscoll and AIG Parent on April 3, 2023) at 4; Price LTI PSU Award Agreement (executed by Price and AIG Parent on April 10, 2023) at 4; Price LTI RSU Award Agreement (executed by Price and AIG Parent on April 10, 2023) at 4; Price LTI Stock Option Award Agreement (executed by Price and AIG Parent on April 10, 2023) at 4; Connolly LTI RSU Award Agreement (executed by Connolly and AIG Parent on April 11, 2023) at 4; Connolly Separation Agreement (executed by Connolly and AIG PC Global Services on February 22, 2024) at 6.

Confidential Information, any failure to comply with [the restrictive covenants] of this Agreement, or any threatened breach of any term of this Agreement."[10]

61.     In his Separation Agreement and Release, Price also acknowledged that his non-solicitation and non-competition obligations (a) "do not impose a greater restraint than is necessary to protect the goodwill or other business interests of AIG;" (b) "contain reasonable limitations as to time and scope of activity to be restrained;" (c) "are not harmful to the general public;" and (d) "are not unduly burdensome."[11] Price further agreed that he would "not assert that, and it should not be considered that, any provisions of [his restrictive covenants] otherwise are void, voidable or unenforceable or should be voided or held unenforceable."[12]

**Price and Connolly's Fee-Shifting Provisions**

62.     Connolly and Price further each agreed that they would each be "liable for the attorneys' fees and costs incurred by AIG as a result of [their] breach of [the restrictive covenants]" contained within their offer letters.[13]

---

[10]   Price Offer Letter (executed by Price and AIG Parent on October 6, 2018) at 5; Connolly Offer Letter (executed by Connolly and AIG Parent on September 24, 2019) at 5.

[11]   Price Separation Agreement and Release (executed by Price and AIG Parent on March 22, 2023) at 5.

[12]   *Id.*

[13]   Price Offer Letter (executed by Price and AIG Parent on October 6, 2018) at 5-6; Connolly Offer Letter (executed by Connolly and AIG Parent on September 24, 2019) at 7.

**D.     Price and Driscoll Depart From AIG and Launch Dellwood As A Direct Competitor In Violation Of Restrictive Covenants And Applicable Law**

63.     On March 7, 2024, only four days after Driscoll's garden leave, duty of loyalty, and non-compete provisions expired, Price and Driscoll publicly announced the formation of Dellwood.[14]

64.     Public records confirm that Dellwood was formed as a Delaware limited liability company more than two months earlier, on December 28, 2023, and that Dellwood was registered to do business in New Jersey no later than January 30, 2024.

65.     According to Dellwood's website, Price serves as Dellwood's CEO, while Driscoll serves as its President and CUO.  These are the same titles they held at AIG.

66.     Dellwood was launched as a direct competitor to AIG.  Indeed, Dellwood's March 7, 2024 press release, titled "Industry Veterans Launch Excess and Surplus Property and Casualty Company, Dellwood Insurance Group, With Over $250 Million in Capital," describes Dellwood as "a new nationwide excess and

---

[14]   March 7, 2024 Dellwood Press Release, "Industry Veterans Launch Excess and Surplus Property and Casualty Company, Dellwood Insurance Group, With Over $250 Million in Capital," https://dellwood.com/wp-content/uploads/2024/03/Announcing_Dellwood_Insurance_Group_Press_Release.pdf (last accessed on March 28, 2024).

surplus lines (E&S) insurance holding company dedicated exclusively to wholesale brokers with an emphasis on small and middle enterprise (SME) risks."   This business is directly competitive with those of the AIG E&S Insurers.

67.    AIG was at the forefront of a recent market trend of moving the E&S market from a dual distribution model to a wholesale-only model.  AIG developed its own unique and proprietary version of the contract bind process that eliminated the need for hiring a fleet of sophisticated underwriters, a substantial cost.  Dellwood appears to have adopted that strategy and, on information and belief, intends to leverage the relevant expertise that Price, Driscoll, Connolly, and other former employees learned at AIG to develop a company that competes against AIG not only in the E&S market but in other segments as well.

68.    According to Dellwood's press release, by March 7, 2024, Dellwood had already engaged Howden Tiger Capital Markets & Advisory as Dellwood's financial advisor and Foley & Lardner as Dellwood's legal advisor.

69.    Dellwood's March 7, 2024 press release also stated that Dellwood entered the market with starting capital exceeding $250 million.  The press release further stated that: "Dellwood is backed by blue-chip companies including RenaissanceRe, PartnerRe, Starr Insurance, and Central Insurance, as well as prominent individual investors including Dominic Addesso, David Delaney, VJ Dowling, Jim Hays, and principals from Stone Point Capital."  On information and

belief, Price and Driscoll raised $250 million in capital by actively marketing Dellwood to these insurance investors, and thereby competing against AIG, at a time when one or both of them was contractually obligated not to compete against AIG.

70.   By March 7, 2024, Dellwood had also hired a suite of employees, including Ann Marie O'Brien in the role of Director of Underwriting Operations and Amelia Kwong in the role of Chief Administrative Officer.  Both O'Brien and Kwong are former AIG employees who departed AIG in mid-2023.  O'Brien's last position at AIG was Contract Bind Operations Manager and Kwong's last position was Chief of Staff of North America General Insurance.  Dellwood has also hired Thad DeBerry, who likewise has a connection with AIG; he previously served as the Chief Operating Officer of Western World around the time it was acquired by AIG. Of the seven Dellwood employees publicly identified on the company's LinkedIn page, all but one have an AIG connection.

71.   On information and belief, Price and Driscoll were able to launch Dellwood, in large part, because of their intimate knowledge of AIG's business, individuals, products, portfolios, systems, relationships, distribution model, and operations, which they used to develop a direct competitor to AIG in violation of their non-competition and non-solicitation obligations.  Their hiring of numerous other former AIG employees further indicates their intention to leverage their

knowledge of AIG's business and Confidential Information to unlawfully compete with AIG.

**E.    Connolly Begins Working For Dellwood While He Is *Still* Employed By AIG And Misappropriates AIG's Confidential Information**

72.    On information and belief, at some point in late-2023 or early-2024, Price and Driscoll solicited Connolly to join them at Dellwood, in direct violation of their non-competition and non-solicitation obligations as well as Driscoll's fiduciary duty of loyalty.

73.    Connolly entered into a Separation Agreement and Release with AIG on February 22, 2024, which provided that his separation from AIG would be effective on March 15, 2024 and that he "shall continue performing . . . employment duties and responsibilities for AIG" until that separation date.[15]   On February 23, 2024, Connolly emailed AIG to confirm that he would continue working for AIG until March 15, 2024.

74.    During this period, AIG learned that Connolly intended to join Dellwood after his separation from AIG.   AIG has since learned that, in fact, Connolly began working for Dellwood ***while still employed by AIG***.   He did so on AIG's time, money, and systems, and in violation of his contractual and fiduciary duties to AIG.   AIG has also recently discovered that Connolly has misappropriated

---

[15]   Connolly Separation Agreement and Release (executed by Connolly and AIG PC Global Services on February 22, 2024) at 1.

AIG Confidential Information for use at Dellwood and solicited AIG employees to join Dellwood.

75.    For example, multiple times on Monday, January 29, 2024—a normal business day nearly seven weeks before his departure from AIG—Connolly sent from his AIG email address to his personal email address a PowerPoint file titled "Financial Modeling and Stress Testing" and related to "a start up organization." This document makes clear that Connolly was performing work for Dellwood that day.  The presentation stated:

> As a start up organization, we are cognizant of the risk and challenges that will be present and the potential impact on our profitability and capital adequacy. We will actively stress test all elements of our financial models.

It went on to describe Dellwood's financial modelling and stress testing:

| Execution | • Start-up trajectory and ability to acquire new business in accordance with our growth targets<br>• Ability to attract top-tier talent could adversely affect growth and / or loss ratio<br>• Regulatory considerations<br>• Speed to market / technology |
|---|---|
| Exogeneous | • Natural catastrophe<br>• Cyber<br>• Pandemic |
| Financial markets | • Lower interest rates reduces future investment income<br>• Financial market volatility<br>• Inability to access capital markets |
| Insurance market | • Excess capital leads to softening market<br>• Loss ratio stress due to inflation (social or other)<br>• Business returns to admitted markets<br>• Availability of reinsurance |

76.     On Monday morning, February 26, 2024—a normal business day nearly three weeks before his departure from AIG—Connolly, using his AIG email address, sent one of his AIG co-workers versions of a multi-tabbed Excel file titled "GOE COA.xlsb," containing both business plans for Dellwood and AIG Confidential Information.  The first tab of the file is a General Operating Expense Chart of Accounts.  The second tab of the file (titled "Hierarchy") lists the payroll hierarchy for Dellwood by function, division, and type.  There are references to Dellwood employees, including each of the Individual Defendants.  The other individuals listed on the "Hierarchy" tab include former AIG employees Amelia Kwong (Executive) and Ann Marie O'Brien (Operations).  This tab also references former Western World employee Thad DeBerry (IT), who is now employed by Dellwood, and Tom Jurgens (Underwriting), another known Dellwood employee.  The tab also references additional persons presumably targeted by Dellwood for employment.  The document also included five hidden tabs, which contain AIG General Ledger accounts and Chart of Accounts and highly sensitive AIG Confidential Information.

77.     That afternoon, Connolly emailed a slightly different version of the GOE COA.xlsb document to another of his AIG co-workers, AIG's Head of Financial Analysis and Process Management, and included the message, "Let's discuss."  In this second version of the document, the "Hierarchy" tab was more

established and was broken down into department, division, and service type.  The document had also been edited to specifically reference Dellwood by name.  The document pertains to Dellwood business, and demonstrates that Connolly was performing work for Dellwood on this day.

78.    The next day, Tuesday, February 27, 2024, Connolly renamed the document from "GOE COA.xlsb" to "to do list.xlsb" and sent it from his AIG email address to his personal email address, for use at Dellwood.

79.    Connolly had no legitimate reason related to his work for AIG to send a document containing Dellwood planning data mixed with AIG accounting and financial information to his co-workers at AIG.  On information and belief, Connolly solicited the two then-current AIG employees to whom he sent this document, on behalf of Dellwood.  One of these employees recently resigned from AIG, effective March 15, 2024 (which was also Connolly's last day as an AIG employee).

80.    Connolly likewise had no legitimate reason related to his work for AIG to send a document containing AIG accounting and financial information to his personal email address.  To the contrary, this was a violation of AIG policy.

81.    On Wednesday, March 7, 2024, a normal business day, Connolly sent another Excel file named 'To dos list.xlsx' from his AIG email address to his personal email address.  The spreadsheet contains a list of to do items and due dates, broken into the categories of: Stat filings, Refresh plan, Finance org chart and job

descriptions, Financial systems, Tax, Financial audit, Investments, Reinsurance, Management reporting, Data, Claims, Collections, and Controls.  Specific tasks with corresponding due dates including "Roll Lannisport forward from year-end" due on March 31, 2024, "RFP" for Financial Audit due on March 1, 2024, and "Chart of Accounts" due on March 15, 2023 are listed.  This document obviously pertains to Dellwood business, and reflects that Connolly was performing work for Dellwood that day.

82.     On March 7, 2024, Connolly received an email from Insurance Insider US about the formation of Dellwood and forwarded this announcement to current and former AIG colleagues, industry colleagues, family members, and his personal email address in six separate emails.  One of the recipients responded with an email indicating that Connolly had previously told him he was joining Dellwood: "Thanks for sharing Tom! . . .  I couldn't be happier for you as well to be joining them on the ground floor on a truly exciting and rare opportunity. I know your talents will be both [] appreciated and leveraged here."  On information and belief, Connolly sent this announcement to AIG employees to solicit them to Dellwood.

83.     On March 14, 2024, Connolly sent an email from his AIG email address to his personal email account with the subject line "Investment Ideas."  That email is a roadmap for the formation of Dellwood's governing committee.  It addresses a "Finance Committee," "Membership," "Membership Roles and Responsibilities,"

and "Meetings."  It also lists the roles for a prospective Finance Committee and its mandate, including the retention of professionals, allocation of assets, and special discretion vested in the Committee's Chair.  The structure Connolly sent to his personal email account was not originally developed.  Rather, it was copied from an AIG "U.S. Regional Investment Advisory Committee Charter" sent to him and other AIG employees on May 4, 2023 by AIG's Head of Investment Reporting of North America General Insurance.

84.    As further evidence of Connolly's work as a secret agent for Dellwood during his final month at AIG, he failed to come into the AIG office, ignored requests from his successor to schedule calls in order to discuss the transition process, and, on at least two occasions, failed to attend scheduled transition calls.  Connolly failed to complete his transition duties but frequently met with the AIG employees that reported to him, some even on a daily basis, as it suited him.  Connolly's failure to perform his transition duties directly contradicted the primary purpose of his remaining at AIG during the month following the execution of his Separation Agreement and Release with AIG on February 22, 2024—to provide a smooth transition of his responsibilities at AIG to his successor.

85.    Despite already commencing work for Dellwood, Connolly did not return one of his AIG-issued computers or his AIG-issued iPad, both which he used for AIG work, on or prior to his last day with AIG, on March 15, 2024.  Instead, he

36

waited nearly a week to mail them back to AIG on March 21, 2024. On information and belief, Connolly was working for Dellwood that week, and had access to and used AIG Confidential Information on his AIG devices for the benefit of Dellwood during that time.

**F.**    **AIG Sends A Cease-and-Desist Letter To Defendants On March 19, 2024**

86.    On March 19, 2024, AIG sent a cease-and-desist letter to Defendants regarding their violations of restrictive covenants and fiduciary duties and misappropriation of AIG's Confidential Information.

87.    AIG's letter demanded that Defendants immediately and fully comply with their continuing obligations to AIG and cease-and-desist from any further violations, tortious interference, and trade secret misappropriation.

88.    AIG's letter further demanded that Defendants immediately return any AIG property, documents, or information in their possession.

89.    Moreover, AIG's letter demanded that Defendants provide several specifically-identified categories of information to assist AIG in evaluating the Individual Defendants' compliance, or lack thereof, with their continuing obligations to AIG and related trade secret misappropriation concerns.

90.    AIG's letter requested that Defendants confirm they would comply with the demands in the letter, and provide the requested information, by March 25, 2024.

91.    In response, Defendants denied that they had engaged in misconduct but requested additional time (until April 26, 2024) to investigate the contentions in AIG's letter and provide the requested information.  This action follows.

**FIRST CAUSE OF ACTION**
**Trade Secret Misappropriation in Violation of the Defend Trade Secrets Act,**
**18 U.S.C. § 1836, and the New Jersey Trade Secrets Act,**
**N.J.S.A. 56:15-3, -4, -6**
**(By AIG E&S Insurers Against All Defendants)**

92.    AIG repeats and realleges paragraphs 1 through 91 of the Complaint as if fully set forth herein.

93.    AIG's "Confidential Information" includes all items or information "related to AIG's business that AIG has not made public or authorized public disclosure of, and that is not generally known to the public through proper means," including "business plans and analysis, customer and prospective customer lists, personal, staffing and compensation information, marketing plans and strategies, research and development data, operational data, methods, techniques, technical data, know-how, innovations, computer programs, un-patented inventions, and trade secrets; and information about the business affairs of third parties (including, but not

limited to, customers and prospective customers) that such third parties provide to [AIG] in confidence."[16]

94.    AIG's Confidential Information constitutes trade secrets.

95.    The AIG E&S Insurers own the trade secrets at issue.

96.    AIG has expended substantial money, time, and effort in developing the Confidential Information.

97.    AIG's Confidential Information is not public, has actual and potential economic value, and is subject to efforts by AIG to keep such information confidential and secret.

98.    AIG employs reasonable measures to ensure that its Confidential Information remains secret, including by entering into agreements that obligate those with access to that Confidential Information to ensure that it is protected.

---

[16]    Driscoll LTI RSU Award Agreement (executed by Driscoll and AIG Parent on March 31, 2023) at 2-3; Driscoll LTI Stock Options Award Agreement (executed by Driscoll and AIG Parent on March 31, 2023) at 3; Driscoll LTI PSU Award Agreement (executed by Driscoll and AIG Parent on April 3, 2023) at 2; Price LTI PSU Award Agreement (executed by Price and AIG Parent on April 10, 2023) at 3; Price LTI RSU Award Agreement (executed by Price and AIG Parent on April 10, 2023) at 2-3; Price LTI Stock Option Award Agreement (executed by Price and AIG Parent on April 10, 2023) at 2; Connolly LTI RSU Award Agreement (executed by Connolly and AIG Parent on April 11, 2023) at 2-3; *see also* Price Offer Letter (executed by Price and AIG Parent on October 6, 2018 with similar language) at 4; Connolly Offer Letter (executed by Connolly and AIG Parent on September 24, 2019 with similar language) at 6-8; Price Separation Agreement and Release (executed by Price and AIG Parent on March 22, 2023 with similar language) at 2-4; Connolly Separation Agreement (executed by Connolly and AIG PC Global Services on February 22, 2024 with similar language) at 2-4.

99.     In their capacities as AIG executives, Connolly, Driscoll, and Price had access to Confidential Information from AIG that is proprietary to AIG about every aspect of the AIG E&S Insurers' overall business strategy, including knowledge and information on all clients, prospects, business partners, revenue, profitability, and services provided to thousands of clients, across all service and industry offerings and geographies.  Each of the Individual Defendants also had access to human resources information including salaries, bonuses, equity awards, performance reviews, calibration reports, email addresses, and cell phone numbers for every employee across multiple regions, including the employees who resigned to join Dellwood. This information has independent economic value, is not generally available to competitors, and is protected by AIG as a trade secret.

100.   AIG's Confidential Information was given to Connolly, Driscoll, and Price pursuant to express agreements that the secrecy of the information would be maintained and that the information would be kept confidential.  These agreements also required the return of this information upon the termination of the employment of Connolly, Driscoll, and Price with AIG.  These provisions are described above.

101.   On information and belief, Connolly, knowingly, with a willful, malicious motive and reckless indifference to the rights of AIG, and in violation of his contractual and fiduciary duties to AIG, accessed AIG's Confidential Information by improper means and misappropriated AIG's Confidential

Information in his last weeks at AIG, despite planning to depart AIG, in order to use such Confidential Information on behalf of Dellwood.

102.   Connolly's trade secret misappropriation includes, but is not limited to, the instances of Connolly forwarding himself AIG's Confidential Information, as described above.   AIG never authorized Connolly to send AIG's Confidential Information to his personal email account, and in fact prohibited him from doing so.

103.   Moreover, despite already commencing work for Dellwood, Connolly did not return one of his AIG-issued computers or his AIG-issued iPad, both which he used for AIG work, on or prior to his last day with AIG, March 15, 2024.  Instead, he waited nearly a week to mail them back to AIG on March 21, 2024.   On information and belief, Connolly was working for Dellwood, and had access to and used AIG Confidential Information on his AIG devices for the benefit of Dellwood, during that time.

104.   On information and belief, Connolly has disclosed AIG's Confidential Information to the other Defendants, who knew or had reason to know that Connolly had acquired the Confidential Information through improper means.

105.   On information and belief, Driscoll and Price knowingly and with a willful, malicious motive and reckless indifference to the rights of AIG, accessed AIG's Confidential Information through improper means and misappropriated

AIG's Confidential Information in order to use such Confidential Information on behalf of Dellwood.

106.   On information and belief, Driscoll and Price's trade secret misappropriation includes, but is not limited to, misappropriation of the AIG E&S Insurers' business review records and other Confidential Information.

107.   On information and belief, Driscoll and Price have disclosed AIG's Confidential Information to the other Defendants, who knew or had reason to know that Driscoll and Price had acquired the Confidential Information through improper means.

108.   The Individual Defendants—and now Dellwood—have intimate knowledge of AIG's Confidential Information that would be critical for the successful launch of a competitor spin-off company.

109.   Defendants possess, and have refused requests to identify and return, all of AIG's Confidential Information in their possession, custody, and control.

110.   On information and belief, Defendants are using, or intend to use, this Confidential Information to conduct Dellwood business, including to compete against AIG; to solicit business from, and transact business with, AIG's current and prospective clients and customers; and to solicit AIG's employees, consultants, registered representatives, and agents to depart AIG and join or do business with Dellwood, without AIG's consent.

111.   Defendants' misappropriation of AIG's Confidential Information has caused and, unless enjoined, will continue to cause damages and irreparable harm to AIG.

112.   As a consequence of the foregoing, AIG has suffered and will continue to suffer irreparable harm and loss, and has sustained damages, including, but not limited to, loss of revenue, valuable business, profits, future profits, and employee morale and goodwill, in an amount to be determined at trial.

113.   Damages are ongoing and continue unabated at the time of filing of this Complaint, thus necessitating the imposition of injunctive relief.

## SECOND CAUSE OF ACTION
**Aiding and Abetting Trade Secret Misappropriation in Violation of
the Defend Trade Secrets Act, 18 U.S.C. § 1836, and the
New Jersey Trade Secrets Act, N.J.S.A. 56:15-3, -4, -6
(By AIG E&S Insurers Against Driscoll, Price, and Dellwood)**

114.   AIG repeats and realleges paragraphs 1 through 91 of the Complaint as if fully set forth herein.

115.   AIG's "Confidential Information" includes all items of information "related to AIG's business that AIG has not made public or authorized public disclosure of, and that [are] not generally known to the public through proper means," including "business plans and analysis, customer and prospective customer lists, personnel, staffing and compensation information, marketing plans and strategies, research and development data, operational data, methods, techniques,

technical data, know-how, innovations, computer programs, un-patented inventions, and trade secrets; and information about the business affairs of third parties (including, but not limited to, customers and prospective customers) that such third parties provide to [AIG] in confidence."[17]

116.   AIG's Confidential Information constitutes trade secrets.

117.   The AIG E&S Insurers own the trade secrets at issue.

118.   AIG has expended substantial money, time, and effort developing the Confidential Information.

---

[17]   Driscoll LTI RSU Award Agreement (executed by Driscoll and AIG Parent on March 31, 2023) at 2-3; Driscoll LTI Stock Options Award Agreement (executed by Driscoll and AIG Parent on March 31, 2023) at 3; Driscoll LTI PSU Award Agreement (executed by Driscoll and AIG Parent on April 3, 2023) at 2; Price LTI PSU Award Agreement (executed by Price and AIG Parent on April 10, 2023) at 3; Price LTI RSU Award Agreement (executed by Price and AIG Parent on April 10, 2023) at 2-3; Price LTI Stock Option Award Agreement (executed by Price and AIG Parent on April 10, 2023) at 2; Connolly LTI RSU Award Agreement (executed by Connolly and AIG Parent on April 11, 2023) at 2-3; *see also* Price Offer Letter (executed by Price and AIG Parent on October 6, 2018 with similar language) at 4; Connolly Offer Letter (executed by Connolly and AIG Parent on September 24, 2019 with similar language) at 6-8; Price Separation Agreement and Release (executed by Price and AIG Parent on March 22, 2023 with similar language) at 2-4; Connolly Separation Agreement (executed by Connolly and AIG PC Global Services on February 22, 2024 with similar language) at 2-4.

119.   AIG's Confidential Information is not public, has actual and potential economic value, and is subject to efforts by AIG to keep such information confidential and secret.

120.   AIG employs reasonable measures to ensure that its Confidential Information remains secret, including by entering into agreements that obligate those with access to Confidential Information to ensure that it is protected.

121.   Upon information and belief, Driscoll, Price, and Dellwood worked in concert with each other, and with Connolly, to misappropriate and use AIG's Confidential Information for their own personal benefit and the benefit of Dellwood, while Connolly was still employed at AIG.

122.   In their capacities as AIG executives, Connolly, Driscoll, and Price had access to Confidential Information from AIG that is proprietary to AIG about every aspect of the AIG E&S Insurers' overall business strategy, including knowledge and information on all clients, prospects, business partners, revenue, profitability, and services provided to thousands of clients, across all service and industry offerings and geographies.  Each of the Individual Defendants also had access to human resources information including salaries, bonuses, equity awards, performance reviews, calibration reports, email addresses, and cell phone numbers for every employee across multiple regions, including the employees who resigned to join

Dellwood.   This information has independent economic value, is not generally available to competitors, and is protected by AIG as a trade secret.

123.   AIG's Confidential Information was given to Connolly, Driscoll, and Price pursuant to express agreements that the secrecy of the information will be maintained and that the information is to be kept confidential.   These agreements also require the return of this information upon the termination of their employment. These provisions are described above.

124.   On information and belief, Connolly knowingly, with a willful, malicious motive and reckless indifference to the rights of AIG, and in violation of his contractual and fiduciary duties to AIG, accessed AIG's Confidential Information through improper means and misappropriated AIG's Confidential Information in his last weeks at AIG, despite planning to depart AIG, in order to use such Confidential Information on behalf of Dellwood.

125.   Connolly's trade secret misappropriation includes, but is not limited to, the instances of Connolly forwarding himself AIG's Confidential Information as described above.   AIG never authorized Connolly to send AIG's Confidential Information to his personal email account, and in fact prohibited him from doing so.

126.   Moreover, despite already commencing work for Dellwood, Connolly did not return one of his AIG-issued computers or his AIG-issued iPad, both which he used for AIG work, on or prior to his last day with AIG, on March 15, 2024.

Instead, he waited nearly a week to mail them back to AIG on March 21, 2024.  On information and belief, Connolly was working for Dellwood, and had access to and used AIG Confidential Information on his AIG devices for the benefit of Dellwood, during this time.

127.   On information and belief, Connolly has disclosed AIG's Confidential Information to the other Defendants, who knew or had reason to know that Connolly had acquired the Confidential Information through improper means.

128.   On information and belief, Driscoll and Price, knowingly, and with a willful, malicious motive and reckless indifference to the rights of AIG, accessed AIG's Confidential Information using improper means and misappropriated AIG's Confidential Information in order to use such Confidential Information on behalf of Dellwood.

129.   On information and belief, Driscoll and Price's trade secret misappropriation includes, but is not limited to, the misappropriation of the AIG E&S Insurers' business review records and other Confidential Information.

130.   On information and belief, Driscoll and Price have disclosed AIG's Confidential Information to the other Defendants, who knew or had reason to know that Driscoll and Price had acquired the Confidential Information through improper means.

131.   The Individual Defendants—and now Dellwood—have intimate knowledge of AIG's Confidential Information that would be critical for the successful launch of a competitor spin-off company.

132.   Defendants have AIG's Confidential Information in their possession, custody, and control and have refused AIG's requests that they identify and return it.

133.   On information and belief, Defendants are using, or intend to use, this Confidential Information to conduct Dellwood business, including to compete against AIG; to solicit business from, and transact business with, AIG's current and prospective clients and customers; and to solicit AIG's employees, consultants, registered representatives, and agents to depart from AIG and join or do business with Dellwood, without AIG's consent.

134.   Defendants' misappropriation of AIG's Confidential Information and Driscoll's, Price's, and Dellwood's aiding and abetting of that misappropriation has caused and, unless enjoined, will continue to cause damages and irreparable harm to AIG.

135.   As a consequence of the foregoing, AIG has suffered and will continue to suffer irreparable harm and loss, and has sustained damages, including, but not limited to, loss of revenue, valuable business, profits, future profits, and employee morale and goodwill, in an amount to be determined at trial.

136.   Damages are ongoing and continue unabated at the time of filing of this Complaint, thus necessitating the imposition of injunctive relief.

### THIRD CAUSE OF ACTION
**Breach of Contract – Restrictive Covenants**
**(By AIG Parent, AIG PC Global, and National Union Against the Individual Defendants)**

137.   AIG repeats and realleges paragraphs 1 through 91 of the Complaint as if fully set forth herein.

138.   The Individual Defendants have violated, *inter alia*, the reasonable post-employment restrictive covenants contained in their respective agreements.

139.   On information and belief, Price and Driscoll violated their non-competition obligations, and Driscoll his garden leave obligations, by establishing Dellwood, engaging in fundraising for its operations, and recruiting current and former AIG employees while these obligations were still active.

140.   On information and belief, all three Individual Defendants have violated their above-described non-competition, non-solicitation, and non-disclosure obligations by (i) actively competing against AIG on behalf of Dellwood, (ii) soliciting AIG employees to work for Dellwood, and (iii) disclosing and using AIG's Confidential Information for the benefit of Dellwood.

141.   The covenants contained in the LTI award, employment, and separation agreements are reasonable in time and scope, and are necessary to protect legitimate business interests of AIG, including the need to protect its goodwill, reputation, and

49

business relationships with its clients, the preservation of the talent in which AIG invests, and its need to maintain the confidentiality of competitively sensitive information.

142.   The Individual Defendants have violated and are continuing to violate their reasonable contractual obligations as set forth above.

143.   AIG Parent, AIG PC Global, and National Union are entitled to recover compensatory damages, including disgorgement of all profits and compensation received by the Individual Defendants on account of their breaches, as well as attorneys' fees.

144.   As a consequence of the foregoing, AIG Parent, AIG PC Global, and National Union have suffered and will continue to suffer irreparable harm and loss, and have sustained damages, including, but not limited to, loss of revenue, valuable business, profits, future profits, and employee morale and goodwill, in an amount to be determined at trial.

**<u>FOURTH CAUSE OF ACTION</u>**
**Tortious Interference with Contract**
**(By AIG Parent, AIG PC Global, and National Union Against Dellwood)**

145.   AIG repeats and realleges paragraphs 1 through 91 of the Complaint as if fully set forth herein.

146.   AIG has valid and enforceable contractual relationships with the Individual Defendants.

50

147.   Due to the fact that Price and Driscoll, the founders and CEO and CUO of Dellwood, are familiar with their own restrictive covenants as well as the restrictive covenants of the other AIG employees who worked for them while they were at AIG, Dellwood knew, or reasonably should have known, of the existence of the valid contractual obligations contained in the Individual Defendants' respective agreements.

148.   Nevertheless, Dellwood has aided, abetted, induced, and assisted the Individual Defendants in breaching their contractual obligations to AIG.

149.   Dellwood induced, encouraged, and/or solicited the Individual Defendants to recruit each other, as well as other AIG employees, to leave their employment in favor of new employment with Dellwood, in violation of their non-solicitation obligations.

150.   Dellwood also induced, encouraged, and/or solicited the Individual Defendants to violate their non-disclosure obligations by misappropriating and using AIG's Confidential Information for their own personal benefit and/or for the benefit of their new employer, Dellwood.

151.   On information and belief, Dellwood induced, encouraged, and/or solicited Price and Driscoll to violate their non-competition obligations, and Driscoll's garden leave obligations, when they worked to create Dellwood while still restricted.

152.   Dellwood's actions were and are without privilege or justification.

153.   AIG is entitled to recover compensatory damages, including disgorgement of all profits and compensation received by Dellwood on account of the Individual Defendants' breaches, as well as attorneys' fees and punitive damages.

154.   As a consequence of the foregoing, AIG has suffered and will continue to suffer irreparable harm and loss, and has sustained damages, including, but not limited to, loss of revenue, valuable business, profits, future profits, and employee morale and goodwill, in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
**Breach of the Fiduciary Duty of Loyalty**
**(By AIG PC Global, National Union, and AIG E&S Insurers Against Connolly and Driscoll)**

155.   AIG repeats and realleges paragraphs 1 through 91 of the Complaint as if fully set forth herein.

156.   Connolly owed a fiduciary duty of loyalty during the course of his employment to AIG PC Global and the AIG E&S Insurers as his employer and the entities to which he provided services.

157.   Connolly violated his fiduciary duty of loyalty by beginning to work for Dellwood, to the detriment of AIG, while he was still actively employed by AIG.

158.   Connolly further violated his fiduciary duty of loyalty by accessing, using, taking and/or disclosing AIG's Confidential Information for competitive purposes while still employed at AIG.

159.   As an example of Connolly's efforts to conceal the breach of his duty of loyalty and avoid detection, Connolly renamed the document previously titled "GOE COA.xlsb" to "to do list.xlsb" when he sent it from his AIG email address to his personal email address on Tuesday, February 27, 2024, with the goal of using this file for the benefit of Dellwood.

160.   Connolly also violated his fiduciary duty of loyalty by soliciting AIG employees to leave their employment at AIG and work for Dellwood while he was still employed at AIG.

161.   Driscoll owed a fiduciary duty of loyalty to National Union and the AIG E&S Insurers as his employer and the entities to which he provided services.

162.   In his offer letter, Driscoll specifically agreed that this duty of loyalty would run through the twelve-month period during which he was on garden leave, which began on March 3, 2023 and ended on March 3, 2024.[18]

163.   On information and belief, Driscoll violated his fiduciary duty of loyalty by actively setting up Dellwood as a competitor to AIG, soliciting AIG

---

[18]   Driscoll Offer Letter (executed by Driscoll and AIG Parent on May 7, 2019) at 4.

employees to leave their employment at AIG and work for Dellwood, and working in concert with Connolly to misappropriate and use AIG's Confidential Information for their own personal benefit and for the benefit of Dellwood while Driscoll was still on garden leave and Connolly was still employed at AIG.

164.   Connolly and Driscoll's misconduct described above was malicious, intentional, fraudulent, and/or reckless.

165. AIG is entitled to recover compensatory damages, including disgorgement of all profits and compensation received by Connolly, Driscoll, and/or Dellwood, as a result of Connolly and/or Driscoll's breaches.

166.   AIG is entitled to punitive damages in order to punish Connolly and Driscoll's blatant disregard of their duties of loyalty, and discourage other AIG employees from similar flagrant violations of this duty.

167.   As a consequence of the foregoing, AIG has suffered and will continue to suffer irreparable harm and loss, and has sustained damages, including, but not limited to, loss of revenue, valuable business, profits, future profits, and employee morale and goodwill, in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
### Aiding and Abetting Breach of the Fiduciary Duty of Loyalty
**(By AIG PC Global, National Union, and AIG E&S Insurers Against Driscoll, Price, and Dellwood)**

168.   AIG repeats and realleges paragraphs 1 through 91 of the Complaint as if fully set forth herein.

169.   Connolly owed a fiduciary duty of loyalty during the course of his employment to AIG PC Global and the AIG E&S Insurers as his employer and the entities to whom he provided services.

170.   Connolly violated his fiduciary duty of loyalty by beginning to work for Dellwood, to the detriment of AIG, while he was still actively employed by AIG.

171.   Connolly further violated his fiduciary duty of loyalty by accessing, using, taking and/or disclosing AIG's Confidential Information for competitive purposes while still employed at AIG.

172.   As an example of Connolly's efforts to conceal the breach of his duty of loyalty and avoid detection, Connolly renamed the document previously titled "GOE COA.xlsb" to "to do list.xlsb" when he sent it from his AIG email address to his personal email address on Tuesday, February 27, 2024, with the goal of using that file for the benefit of Dellwood.

173.   Connolly also violated his fiduciary duty of loyalty by soliciting AIG employees to leave their employment at AIG and work for Dellwood while Connolly was still employed at AIG.

174.   Driscoll owed a fiduciary duty of loyalty to National Union and the AIG E&S Insurers as his employer and the entities to which he provided services.

175.   In his offer letter, Driscoll specifically agreed that this duty of loyalty would run through the twelve-month period during which he was on garden leave, which began on March 3, 2023 and ended on March 3, 2024.[19]

176.   On information and belief, Driscoll violated his fiduciary duty of loyalty by actively setting up Dellwood as a competitor of AIG, soliciting AIG employees to leave their employment at AIG and work for Dellwood, and working in concert with Connolly to misappropriate and use AIG's Confidential Information for their own personal benefit and for the benefit of Dellwood while Driscoll was still on garden leave and Connolly was still employed at AIG.

177.   Connolly and Driscoll's misconduct described above was malicious, intentional, fraudulent, and/or reckless.

178.   On information and belief, Driscoll, Price, and Dellwood worked in concert with Connolly to misappropriate and use AIG's Confidential Information for their own personal benefit and the benefit of Dellwood, and to convince AIG employees to leave AIG and join Dellwood, while Connolly was still employed at AIG.

179.   On information and belief, Price and Dellwood worked in concert with Driscoll to misappropriate and use AIG's Confidential Information for their own

---

[19]   Driscoll Offer Letter (executed by Driscoll and AIG Parent on May 7, 2019) at 4.

personal benefit and the benefit of Dellwood, and to convince AIG employees to leave AIG and join Dellwood,  while Driscoll was still on garden leave with AIG.

180.   On information and belief, Driscoll, Price, and Dellwood worked in concert with Connolly, and Price and Dellwood worked in concert with Driscoll, to breach their respective duties of loyalty to further Dellwood's own future business.

181.   Driscoll, Price, and Dellwood knew, and continue to know, that Connolly owed substantive legal duties to AIG during the course of his employment, including Connolly's common-law fiduciary duty of loyalty.

182.   Price and Dellwood knew, and continue to know, that Driscoll owed substantive legal duties to AIG during the course of his garden leave with AIG, including Driscoll's common-law and contractual fiduciary duty of loyalty.

183.   On information and belief, Driscoll, Price, and Dellwood maliciously, intentionally, fraudulently, and/or recklessly provided substantial encouragement to Connolly to breach his fiduciary duties to AIG to further Dellwood's own future business while Connolly was still employed by AIG.

184.   On information and belief, Price and Dellwood maliciously, intentionally, fraudulently, and/or recklessly provided substantial encouragement to Driscoll to breach his fiduciary duties to AIG to further Dellwood's own future business while Driscoll was still on garden leave with AIG.

185.   AIG is entitled to recover all compensatory damages, including disgorgement of all profits and compensation received by Driscoll, Price, and Dellwood as a result of Connolly and Driscoll's breaches.

186.   AIG is entitled to punitive damages due to Driscoll, Price, and Dellwood providing substantial assistance and encouragement for Connolly to breach his duties to AIG.

187.   AIG is entitled to punitive damages due to Price and Dellwood providing substantial assistance and encouragement for Driscoll to breach his duties to AIG.

188.   As a consequence of the foregoing, AIG has suffered and will continue to suffer irreparable harm and loss, and has sustained damages, including, but not limited to, loss of revenue, valuable business, profits, future profits, and employee morale and goodwill, in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
### Unfair Competition
### (By AIG PC Global, National Union, and AIG E&S Insurers Against All Defendants)

189.   AIG repeats and realleges paragraphs 1 through 91 of the Complaint as if fully set forth herein.

190.   Defendants were aware of the restrictions contained in the employment agreements of the Individual Defendants as well as Connolly and Driscoll's fiduciary duties.

191.   Defendants agreed to ignore the restrictions set forth in the employment agreements of the Individual Defendants as well as Connolly's fiduciary duties, and take actions to lure AIG's employees and Confidential Information to Dellwood in violation of those restrictions.

192.   Defendants, by engaging in the conduct described above, have engaged in unfair competition with AIG.

193.   Their conduct has caused and, unless enjoined, will continue to cause damage to AIG's business relationships with its clients and other valuable business interests.

194.   By violating the restrictions set forth in the employment agreements of Connolly, Driscoll, and Price as well as Connolly and Driscoll's fiduciary duties, Defendants have damaged AIG's businesses by unfair methods.

195.   Defendants' conduct has been (and continues to be) willful, intentional, and unprivileged and has caused (and will continue to cause) AIG to suffer immediate, irreparable harm, as well as other compensatory damages.

196.   Defendants are enjoying or will enjoy the benefits of their unfair competition.

197.   AIG is entitled to recover all compensatory damages, including disgorgement of all profits and compensation received by Defendants, as well as punitive damages.

198.   As a consequence of the foregoing, AIG has suffered and will continue to suffer irreparable harm and loss, and has sustained damages, including, but not limited to, loss of revenue, valuable business, profits, future profits, and employee morale and goodwill, in an amount to be determined at trial.  Defendants' damages are ongoing and continue unabated at the time of filing of this Complaint, thus necessitating the imposition of injunctive relief.

**EIGHTH CAUSE OF ACTION**
**Unauthorized Access of AIG's Computers In Violation of the U.S. Computer Fraud and Abuse Act, 18 U.S.C. § 1030**
**(By AIG PC Global and AIG E&S Insurers Against Driscoll, Price, and Dellwood)**

199.   AIG repeats and realleges paragraphs 1 through 91 of the Complaint as if fully set forth herein.

200.   AIG's computers are "protected computers" within the meaning of 18 U.S.C. § 1030(e) because they are computers purchased and used by AIG in interstate or foreign commerce or communication.

201.   The computers at issue belong to AIG PC Global and the AIG E&S Insurers.

202.   On information and belief, Driscoll, Price, and Dellwood, through individuals working on their behalf, including but not limited to Connolly, knowingly, intentionally, and with the intent to defraud AIG, accessed AIG's computers without authorization in an effort to download, copy, transfer, or in some

manner obtain files, documents, spreadsheets, programs, code, macros, and/or electronically stored information containing AIG's Confidential Information.

203.   Driscoll, Price, and Dellwood were not authorized to access AIG's computers and/or exceeded their authorized access to do so.

204.   On information and belief, Driscoll, Price, and Dellwood utilized third persons, including but not limited to Connolly, while he was still an AIG employee, to obtain access to AIG's computers and systems and the Confidential Information contained therein.

205.   Driscoll, Price, and Dellwood cannot obtain through third persons the authority to access AIG's computers that Defendants do not themselves have.

206.   As a result, Driscoll, Price, and Dellwood caused AIG damages and loss in excess of $5,000.  This loss includes but is not limited to the cost to AIG of responding to Defendants' violations described above, which consists of an interruption of service and use of AIG's computers in order to investigate and assess the unauthorized access and loss, a damage assessment, and the investigation of AIG's computers and related systems following Defendants' violations, as alleged above.

207.   AIG is entitled to recover all compensatory damages, including disgorgement of all profits and compensation received by Defendants, as well as punitive damages and attorneys' fees.

208.   As a consequence of the foregoing, AIG has suffered and will continue to suffer injury, loss, damages, and irreparable harm, including but not limited to impairment to the integrity and exclusive availability of confidential information that belongs to AIG and resided on its computers and computer systems, as alleged above, and other business damages, and has sustained damages including but not limited to loss of capital, loss of valuable business, loss of profits and future profits, and loss of goodwill, in an amount to be determined at trial.  Damages are ongoing and continue unabated at the time of the filing of this Complaint.

## PRAYER FOR RELIEF

**WHEREFORE**, AIG respectfully requests that the Court:

1.   Enter an injunction enjoining Defendants from directly or indirectly, whether alone or in concert with others, including any employee, consultant, registered representative, or agent of Dellwood:

> A.   Soliciting, participating in the solicitation or recruitment of, or in any manner encouraging or providing assistance to any employee, consultant, registered representative, or agent of AIG to terminate his or her employment or other relationship with AIG or to leave its employ or other relationship with AIG for any engagement in any capacity or any other person or entity, for the duration of their restricted periods, with tolling for any period of noncompliance;

> B.   Soliciting, contacting, calling upon, communicating with or attempting to communicate with any customer or client or prospective customer or client of AIG where

doing so would require the use or disclosure of confidential, proprietary and/or trade secret information;

C.      Using, divulging, or making accessible to any other person, firm, partnership, corporation, or other entity, any of AIG's confidential or proprietary information; and

D.      Destroying, erasing, or otherwise making unavailable for further proceedings in this matter any records or documents (including data or information maintained in computer media) in Defendants' possession or control that were obtained from or contain non-public information derived from any records of AIG, including, but not limited to, confidential information relating to AIG's clients or prospective clients, or that relate to any of the events alleged in the Complaint;

2.      Order Defendants to return to AIG's counsel any and all records or information pertaining to AIG's confidential and proprietary information, including trade secrets, whether in the original, copies, computerized, handwritten, or any other form, and purge such information from Defendants' possession, custody, or control, provided, however, that any information so purged shall be printed and saved to a computer disk or similarly accessible and readable recording device prior to purging and be returned to AIG pursuant to this paragraph;

3.      Award AIG actual damages for the foregoing wrongful acts by Defendants, in an amount to be proven at trial;

4.      Award AIG compensatory damages under common law for the foregoing wrongful acts by Defendants, in an amount to be proven at trial;

5.    Award AIG exemplary and punitive damages for the foregoing willful and intentional wrongful acts by Defendants, in an amount to be proven at trial;

6.    Award AIG attorneys' fees, costs, and expenses;

7.    Award AIG pre- and post-judgment interest as allowed by law; and

8.    Award AIG such other damages and relief as are fair and reasonable based upon the evidence presented at trial.

Dated:  April 2, 2024                    Respectfully submitted,

**MARINO, TORTORELLA & BOYLE, P.C.**

*/s/ Kevin H. Marino*
Kevin H. Marino
John A. Boyle
437 Southern Boulevard
Chatham, New Jersey 07928-1488
(973) 824-9300

**QUINN EMANUEL URQUHART
   & SULLIVAN, LLP**
Michael B. Carlinsky (*pro hac vice* application forthcoming)
Kevin S. Reed (*pro hac vice* application forthcoming)
Kimberly Carson (*pro hac vice* application forthcoming)
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Plaintiffs*

64

<u>**JURY DEMAND**</u>

Pursuant to Fed. R. Civ. P. 38, AIG hereby demands a trial by jury on all such issues that so may be tried.

Dated:  April 2, 2024                    Respectfully submitted,

**MARINO, TORTORELLA & BOYLE, P.C.**

<u>*/s/ Kevin H. Marino*</u>
Kevin H. Marino
John A. Boyle
437 Southern Boulevard
Chatham, New Jersey 07928-1488
(973) 824-9300

**QUINN EMANUEL URQUHART
    & SULLIVAN, LLP**
Michael B. Carlinsky (*pro hac vice* application
forthcoming)
Kevin S. Reed (*pro hac vice* application
forthcoming)
Kimberly Carson (*pro hac vice* application
forthcoming)
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Plaintiffs*

65