<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

AMERICAN INTERNATIONAL GROUP, INC., *et al.*,

     Plaintiffs,

     v.

DELLWOOD INSURANCE GROUP, LLC,

     Defendant.

No. 24cv4456 (EP) (JBC)

**OPINION**

**PADIN, District Judge.**

Plaintiffs American International Group, Inc., AIG PC Global Services, Inc., National Union Fire Insurance Co. of Pittsburgh PA, AIG Specialty Insurance Company, Blackboard Specialty Insurance Company, Lexington Insurance Company, Tudor Insurance Company, and Western World Insurance Company (collectively, "AIG"), allege that non-party former senior AIG executives, Michael Price and Kean Driscoll, attempted to "jump start" their newly formed business and AIG competitor, Defendant Dellwood Insurance Group, LLC ("Dellwood"), by misappropriating AIG's trade secrets and confidential information and inducing AIG executives to breach their obligations and duties to AIG.

AIG alleges trade secret misappropriation in violation of the Defend Trade Secrets Act[1] ("DTSA") and the New Jersey Trade Secrets Act[2] ("NJTSA") (Count I); tortious interference with contract (Count II); aiding and abetting breach of the fiduciary duty of loyalty (Count III); unfair competition (Count IV); and unauthorized access of AIG's computers in violation of the U.S.

---

[1] 18 U.S.C. § 1836.
[2] N.J. Stat. Ann. 56:15-3, -4, -6.

Computer Fraud and Abuse Act[3] ("CFAA") (Count V).  D.E. 38 ("FAC").  Dellwood moves to dismiss the FAC.  D.E. 39-1 ("Motion" or "Mot.").  The Court decides the Motion without oral argument.  *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b).  For the following reasons, the Court will **GRANT in part** and **DENY in part** the Motion.

## I.    BACKGROUND[4]

### A.    Factual Background

#### 1.    *AIG's insurance business*

AIG is a "leading international insurance and financial services organization."  FAC ¶ 36.  Amongst its other services, AIG is a market leader in excess and surplus lines ("E&S") insurance.  *Id.* ¶¶ 37-38.  As a result of AIG's "intellectual labor and significant investments," it experienced "explosive growth" in its E&S business.  *Id.* ¶ 38.

#### 2.    *The Former Executives' roles at AIG*

Price was formerly the Deputy CUO[5] of North America General Insurance before being promoted to the CEO of North America General Insurance.  *Id.* ¶ 40.  Prior to his start at AIG in November 2018, Price had no significant experience or expertise in the E&S business.  *Id.*  As CEO of North America General Insurance, Price's responsibilities included "managing the high level affairs of AIG's North America General Insurance business, developing long-term corporate strategy, and overseeing business operations."  *Id.*  Price separated from AIG on June 30, 2023.  *Id.*

---

[3] 18 U.S.C. § 1030.
[4] Unless otherwise noted, the facts in this section are taken from the well-pled factual allegations in the FAC which the Court presumes to be true for purposes of resolving the motion to dismiss.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).
[5] Chief Underwriting Officer.

Like Price, before AIG hired Driscoll as Global CUO of General Insurance in July 2019, Driscoll had no significant experience in the E&S business. *Id.* ¶ 41. As Global CUO of General Insurance, Driscoll's responsibilities included "maintaining underwriting standards and promoting underwriting strategy." *Id.* Driscoll separated from AIG on March 3, 2023. *Id.*

AIG hired Thomas Connolly (together with Price and Driscoll, the "Former Executives") in October 2019 as CFO of Global Travel, Warranty and Multinational before promoting him to CFO of North America General Insurance in March 2020. *Id.* ¶ 42. As CFO of Global Travel, Warranty and Multinational, Connolly was responsible for "managing the financial activities of AIG's North America General Insurance business, making investment decisions and overseeing capital structure." *Id.* Connolly separated from AIG on March 15, 2024.

The Former Executives had experience at AIG providing services to the AIG E&S Insurers. *Id.* ¶¶ 40-42. They also all had access to AIG's confidential information including internal business reviews (including those for the AIG E&S Insurers) which contained sensitive, proprietary, and confidential information regarding AIG's "pricing, key initiatives, strategy, and performance and financial analyses." *Id.* ¶ 44.

### 3. *The Former Executives enter restrictive covenants with AIG*

In connection with their employment at AIG, the Former Executives agreed to a series of post-employment restrictive covenants. Price agreed not to compete with AIG (through September 30, 2023), interfere with AIG's customer relationships (through September 30, 2023), solicit AIG's employees (through June 30, 2024), disclose AIG's confidential information (no expiry date), solicit AIG's customers where doing so would require use or disclosure of AIG's confidential information (no expiry date), or disparage AIG (no expiry date). *Id.* ¶ 47.

Driscoll agreed to a garden leave provision that expired on March 3, 2024. *Id.* ¶ 48. He also agreed not to compete with AIG or violate his fiduciary duty of loyalty (through March 3,

3

2024), solicit AIG's employees (through March 3, 2024), solicit AIG's customers where doing so would require use or disclosure of AIG's confidential information (no expiry date), disclose AIG's confidential information (no expiry date), or disparage AIG (no expiry date). *Id.*

Connolly agreed to not solicit AIG employees (through March 15, 2025), solicit AIG's customers where doing so would require use or disclosure of AIG's confidential information (no expiry date), disclose AIG's confidential information (no expiry date), or disparage AIG (no expiry date). *Id.* ¶ 49.

### 4. *Dellwood launches as a direct competitor to AIG*

Three days after Driscoll's garden leave expired, on March 7, 2024, Dellwood announced its formation as a competitor to AIG in the E&S insurance market. *Id.* ¶ 65. Dellwood founders Price and Driscoll served as its CEO and CUO respectively—the same titles they held at AIG. *Id.* ¶ 66. Connolly joined Dellwood a week after its public launch as CFO—the same title he held at AIG. *Id.* ¶ 67. For months prior to Dellwood's launch, the Former Executives worked "behind the scenes" to develop Dellwood as a competitor to AIG, including by acquiring another insurance company in early January 2024, raising more than $250 million in seed capital from investors, engaging financial and legal advisors, and hiring other former AIG employees. *Id.* ¶¶ 71-72, 75-78.

Dellwood's launch was enabled, in large part, by the Former Executives' and other former AIG employees' knowledge of confidential and proprietary information about AIG's business, employees, products, portfolios, systems, relationships, distribution model, and operations. *Id.* ¶ 70.

Dellwood replicated AIG's E&S business plan, targeted AIG's clients, and used marketing pitches with striking resemblance to those used by AIG. *See id.* ¶¶ 80-85. Dellwood's website touts its "purpose-built" "Modern E&S Ecosystem" that brings "know-how to the E&S market."

*Id.* ¶ 80.  Dellwood advertises an "online platform" to "provide the tools and support to rate, bind and issue General Liability and Package solution for a wide range of classes," similar to AIG's Western World Integrated Platform ("WWIP") which is "one of the industry's first contract bind systems."  *Id.* ¶ 81.  Like AIG's WWIP system that "enables quick and seamless insurance solutions for small- and medium-sized enterprises (SMEs) clients," Dellwood's system "accelerate[s] placement of small & medium commercial risks."  *Id.* ¶ 82.  Dellwood also boasts about the talent it acquired from AIG advertising its "deep expertise," "program development expertise," and "industry-leading experts."  *Id.* ¶ 83.

> 5.    *Dellwood deploys Connolly as a "double agent" while he is still employed by AIG*

Prior to February 2024, Price and Driscoll, on behalf of Dellwood, solicited Connolly to join Dellwood.  *Id.* ¶ 87.  On February 22, 2024, Connolly entered into a Separation Agreement and Release with AIG, which provided that he would continue to work for AIG until March 15, 2024.  *Id.* ¶ 88.  However, Connolly did not wait until March 15 to start his work for Dellwood— "[a]t some point prior to February 2024," Connolly began collecting information to take with him to Dellwood.  he stopped coming into work at AIG, did not attend regularly scheduled meetings, and began efforts on behalf of Dellwood.  *Id.* ¶¶  87, 89.

During this period and prior to his separation, "at the direction of and with assistance from Dellwood," Connolly sent documents from his AIG email account to his personal email account regarding Dellwood's business plans that contained confidential information about AIG's business and finances.  *Id.* ¶¶ 91-92, 96, 98, 102, 104.  For example, on March 7, 2024, Connolly sent an Excel file titled "To dos list.xlsx" from his AIG email address to his personal email address which contained, *inter alia*, components of AIG's confidential 2024 business plan.  *Id.* ¶ 102.  Connolly also solicited AIG coworkers to join Dellwood by sending Dellwood-related documents to AIG

coworkers when he was supposed to be still working for AIG. *Id.* ¶¶ 93, 95, 97, 100-01. For example, on March 5, 2024, Connolly emailed another AIG employee a document containing AIG's confidential "North American 2024 Plan Guide and Timeline" (the "AIG 2024 Plan Guide") and a list of tasks related to Dellwood's business plan, which was updated on March 7, 2024 to include components taken from the AIG 2024 Plan Guide. *Id.* ¶¶ 100, 102.

### B.    Procedural Background

On March 19, 2024, AIG sent a cease-and-desist letter to Dellwood and the Former Executives. *Id.* ¶¶ 112-13. Dellwood and the Former Executives responded, denying any misconduct, and requested until April 26, 2024 to investigate and provide information requested in the cease-and-desist. *Id.* ¶¶ 116-17. AIG decided not to wait for Dellwood to investigate and initiated this action on April 2, 2024, suing both Dellwood and the Former Executives. D.E. 1.

On May 24, 2024, AIG voluntarily dismissed its claims against the Former Executives *with prejudice*. D.E. 18. Dellwood moved to dismiss the Complaint on June 21, 2024, D.E. 32, but on July 10, 2024, AIG amended the Complaint, FAC, mooting Dellwood's motion to dismiss the original Complaint. On July 31, 2024, Dellwood moved to dismiss the FAC. Mot. AIG opposes. D.E. 45 ("Opp'n"). Dellwood replies. D.E. 46 ("Reply").[6] After briefing on the Motion was complete, the Court granted the parties' joint request to stay discovery while the Court considered the Motion. D.E. 55.

---

[6] After Dellwood's Reply, AIG filed an unauthorized sur-reply letter without first obtaining leave from the Court as required by L. Civ. R. 7.1(d)(6). D.E. 47. The next day, AIG belatedly moved for leave to file a sur-reply, which Dellwood opposed. D.E.s 48, 49. The Court denied AIG's motion for leave to file a sur-reply, D.E. 50, and will not consider the unauthorized sur-reply letter, D.E. 47.

## II.    LEGAL STANDARD

Rule 12(b)(6) permits the dismissal of a case for failure to state a claim.  In reviewing a motion to dismiss for failure to state a claim, the reviewing court accepts all well-pled facts as true, construes the complaint in the plaintiff's favor, and determines "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation marks and citation omitted).  To survive a Rule 12(b)(6) challenge, the plaintiff's claims must be facially plausible, meaning that the well-pled facts "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at  678.  The allegations must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Finally, "[i]n deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

## III.    ANALYSIS

### A.    *Res Judicata* Does Not Apply

Dellwood argues that because AIG voluntarily dismissed the Former Executives from this lawsuit *with prejudice*, the doctrine of *res judicata*[7] precludes AIG from pursuing its claims against Dellwood that are all based on actions taken by the Former Executives.  Mot. at 11-19.  The Court disagrees.

"A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Sheridan v. NGK Metals*

---

[7] Also referred to as "claim preclusion."

7

*Corp.*, 609 F.3d 239, 259 (3d Cir. 2010) (cleaned up). Therefore, for *res judicata* to apply, the "defendant must show that there has been '(1) a final judgment on the merits in a prior suit involving; (2) the same parties or their privies; and (3) a subsequent suit based on the same causes of action.'" *Id.* at 260 (quoting *Rivet v. Regions Bank of La.*, 522 U.S. 470, 473 (1998)).[8] This "conceptual test" is not applied "mechanically"—rather, courts "'focus on the central purpose of the doctrine, to require a plaintiff to present all claims arising out [of] the same occurrence in a single suit.'" *Id.* (quoting *Rivet*, 522 U.S. at 473).

*Res judicata* is almost always applied to a later lawsuit based on final judgments occurring in an earlier lawsuit. As AIG points out, there is a wealth of authority that defines *res judicata* as applying only to subsequent suits where there was a final judgment on the merits in a prior suit. *See, e.g.*, *Brownback v. King*, 592 U.S. 209, 220 (2021) (Sotomayor, J., concurring) (rejecting an argument that, after an order resolving one claim, *res judicata* precludes separate claims involving the same nucleus of operative facts brought in the same action because this was a "significant departure from the normal operation of common-law claim preclusion, which applies only in separate or subsequent suits following a final judgment"); *G. & C. Merriam Co. v. Saalfield*, 241 U.S. 22, 29 (1916) ("The doctrine of *res judicata* furnishes a rule for the decision of a subsequent case between the same parties or their privies respecting the same cause of action. Obviously, the rule for decision applies only when the subsequent action has been brought."); *Defoe v. Phillip*, 702 F.3d 735, 741 (3d Cir. 2012) (stating that *res judicata* "applies only if there was 'a final judgment on the merits in a *prior suit*'") (emphasis in original) (quoting *United States v. 5 Unlabeled Boxes*, 572 F.3d 169, 173 (3d Cir. 2009)); *Rezzonico v. H&R Block, Inc.*, 182 F.3d 144,

---

[8] The same elements apply under both New Jersey and federal law. *See Siljee v. Atlantic Stewardship Bank*, No. 15-1762, 2016 WL 2770806, at *7 (D.N.J. May 12, 2016).

148 (2d Cir. 1999) ("*Res judicata* does not speak to direct attacks in the same case, but rather has application in subsequent actions."); *Robinson v. City of Harvey, Ill.*, 617 F.3d 915, 916 (7th Cir. 2010) ("[I]ssue and claim preclusion concern the effect of one suit on a later suit and have nothing to do with how issues are resolved within a single case.").

Still, Dellwood points out that, in certain circumstances, some district courts have applied *res judicata* within the same case. *See, e.g.*, *Progme Corp. v. Comcast Cable Commc'ns*, No. 17-1488, 2017 WL 5070723, at *3-*5 (E.D. Pa. Nov. 3, 2017); *In re EP Liquidation, LLC*, 583 B.R. 304, 315 (Bankr. D. Del. 2018); *Gosselin v. Field, Hurley, Webb & Sullivan*, 188 F. Supp. 2d 107 (D. Mass. 2002); *Bonds v. NJ Judiciary Admin. of Court*, No. 19-18983, 2023 WL 2214011, at *3 (D.N.J. Feb. 24, 2023). However, apart from being non-binding on this Court, these cases arise under materially different circumstances and are readily distinguishable.

In *Progme*, the plaintiff dismissed *with prejudice* NBC Universal, Inc. ("NBC Inc."), a predecessor company to NBC Universal Media, LLC ("NBC LLC"), the successor in interest to NBC Inc. *See Progme*, 2017 WL 5070723 at *5. The court found that the dismissal *with prejudice* as to NBC Inc. should also apply to NBC LLC since NBC Inc. merely "convert[ed] itself from a corporation to a limited liability company . . . ." *Id.* Here, unlike in *Progme*, Dellwood is not merely a successor in interest to the dismissed defendants.

In *In re EP Liquidation*, the court found that amendment to add claims against a defendant who was voluntarily dismissed *with prejudice* would be futile because the claims were barred by *res judicata*. *See In re EP Liquidation*, 583 B.R. at 315. Here, different defendants are at issue.

In *Gosselin*, the court found that a law firm defendant who was vicariously liable for the malpractice of an attorney could invoke the plaintiff's dismissal *with prejudice* of the claim against the attorney to bar the claim against the law firm. *See Gosselin*, 188 F.Supp.2d at 110. Here, AIG

alleges that Dellwood is directly, not vicariously, liable for acts that it directed its senior employees to commit based on an agency relationship. *See generally* FAC ¶¶ 118-203.[9]

Finally, *Bonds*, like *In re EP Liquidation*, involved claims that were previously dismissed against a defendant where the plaintiff tried to reassert the same claims against the same defendant. *See Bonds*, 2023 WL 2214011, at *4.

A similar situation to the case at bar arose in *In re Hyman*, 335 B.R. 32, 37 n.3 (S.D.N.Y. 2005), where a bankruptcy debtor argued that a creditor's voluntary dismissal *with prejudice* of one of his claims constituted a final judgment on the merits that has preclusive effect to other related claims in the same case. The court found that there was no law supporting the applicability of *res judicata* to "claims adjudicated in the same action as opposed to those adjudicated in previous actions." *Id.* The district court credited the bankruptcy court's finding that the creditor "in no way intended for the voluntary dismissal" of some parties to bar its already existing claims against other parties. *Id.* The same is true here.

AIG brought claims against the Former Executives and Dellwood together and then voluntarily dismissed its claims against the Former Executives *with prejudice* in order to avoid arbitration that was potentially applicable to claims against the Former Executives. Opp'n at 13 (citing D.E.s 18, 19). AIG made clear that it was not dismissing any claims against Dellwood and fully intended to continue those claims. The Court is unaware of any case, let alone binding authority, that sanctions the use of *res judicata* to preclude claims such as AIG's claims against Dellwood under these circumstances.

---

[9] Moreover, even if *Gosselin* involved direct liability, the Court is unpersuaded that its reasoning should apply here.

To the extent there are situations where *res judicata* may apply within the same case, this is not one of them. There is good reason why courts have not applied *res judicata* to situations like the case here. The purpose of *res judicata* is not a game of "gotcha" for parties to try and escape claims based on voluntary dismissals of other defendants. The purpose of the doctrine— to "'require a plaintiff to present all claims arising out [of] the same occurrence in a single suit'"— is not served by disallowing AIG's claims against Dellwood merely because AIG, within the same case, decided to pursue the company and not the individuals. *Sheridan*, 609 F.3d at 260 (quoting *Rivet*, 522 U.S. at 473).[10] Therefore, the Court finds that *res judicata* does not apply here.

The same holds true when focusing solely on AIG's claims against Dellwood for tortious interference with contract (Count II) and aiding and abetting breach of the fiduciary duty of loyalty (Count III). Dellwood argues that even if *all* of AIG's claims are not precluded, *res judicata* does at least bar Counts II and III because Dellwood's liability for these counts hinges on the Former Executives conduct. Mot. at 16-19. The Court disagrees. Because the Court has already found that the purpose of *res judicata* is not furthered by applying it to the circumstances presented in this case, the viability of Counts II and III depends on whether those counts have been adequately pled.

Furthermore, Dellwood does not argue that collateral estoppel applies to preclude a finding of an underlying breach of contract or fiduciary duty—nor could it. Collateral estoppel applies only to "bar successive litigation of an issue of fact or law *actually litigated* and resolved in a valid court determination." *Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*, 571 F.3d 299,

---

[10] The result would likely be different had AIG not sued Dellwood initially and sought to initiate a separate lawsuit against Dellwood after dismissing the Former Executives *with prejudice*. Not only would that scenario fall into the well-established framework for applying *res judicata*, but it would also further the purpose of *res judicata* by not allowing AIG to pursue claims that should have been brought in this litigation initially.

310 (3d Cir. 2009) (emphasis added).  Issues of whether there has been an underlying breach of contract or fiduciary duty have not yet been litigated.  Simply because AIG chose not to pursue breach of contract or breach of fiduciary duty counts against the Former Executives individually does not mean that it cannot plead those primary violations as elements to secondary violations of tortious interference with contract and aiding and abetting breach of fiduciary duty.  *See, e.g.*, *Martinez v. Swomiak*, No. A-1185-17T1, 2018 WL 4623364, at *1 (N.J. App. Div. Sept. 27, 2018) (analyzing the merits of an aiding and abetting claim even after underlying individual tortfeasor was voluntarily dismissed *with prejudice*).[11]

## B.    AIG Adequately Alleges Misappropriation of Trade Secrets Under the DTSA and NJTSA (Count I)

Dellwood also challenges the adequacy of the allegations as to each count.  Dellwood first argues that Count I should be dismissed because (a) the information AIG alleges Dellwood obtained does not constitute "trade secrets," and (b) AIG does not allege that Dellwood "acquired" such information.  Mot. at 20-29.  The Court disagrees.

An "owner of a trade secret that is misappropriated" has a private right of action so long as the "trade secret is related to a product or services used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1).[12]  A "trade secret" includes:

---

[11] Although Dellwood does not argue that the law-of-the-case doctrine supports its position, even if Dellwood was confusing *res judicata* with the law-of-the-case doctrine, AIG's voluntary dismissal of the Former Executives would still not be entitled to preclusive effect as to the merits of claims against Dellwood here.  The law-of-the-case doctrine holds that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Speeney v. Rutgers*, 369 F. App'x 357, 359 (3d Cir. 2010).  However, this doctrine applies only to "issues that the parties had a full and fair opportunity to litigate and that the Court actually decided. *See id.*; *Home Depot USA, Inc. v. Lafarge N. Am., Inc.*, 59 F.4th 55, 62 (3d Cir. 2023).  Dellwood does not argue that it actually litigated the issues it seeks preclusive effect over prior to its Motion, nor could it.  This Motion is the first time the Court is called upon to consider the merits of AIG's claims.

[12] "Because the DTSA and the NJTSA are substantially similar as a whole and because they include identical or almost identical definitions for each statutory term at issue here," the Court's DTSA

> all forms and types of financial, business, scientific, technical, economic, or engineering information . . . if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3). Misappropriation can include "improper acquisition, disclosure, *or* use of a trade secret without consent." *Oakwood Labs.*, 999 F.3d at 907-08 (citing § 1839(5)) (emphasis added). Alleging trade secret misappropriation itself alleges harm to the plaintiff. *See id.* at 913.

### 1.    *AIG adequately alleges that the information Connolly took to Dellwood included AIG's trade secrets*

Dellwood argues that AIG's allegations do not specify the trade secrets with sufficient detail. Mot. at 20-24. The Court disagrees. "[I]nformation alleged to be a misappropriated trade secret must be identified with enough specificity to place a defendant on notice of the bases for the claim being made against it." *Oakwood Labs.*, 999 F.3d at 906. However, "a plaintiff need not spell out the details of the trade secret to avoid dismissal." *Id.* (cleaned up). "Rather, the subject matter of the trade secret must be described with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." *Id.* (cleaned up).

Here, AIG alleges that, while Connolly was still employed by AIG, Dellwood induced him to act as a "double agent" to acquire information for Dellwood pertaining to AIG's business plans, general ledger accounts, a chart of AIG accounts, expense information, and other financial information. FAC ¶¶ 86-87, 90-106. For example, AIG alleges that on February 27, 2024,

---

analysis also applies to AIG's claims under the NJTSA. *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 905 n.11 (3d Cir. 2021); *see Am. Neighborhood. v. CrossCountry Mortg.*, No. 20-00874, 2022 WL 1423090, at *6 (D.N.J. May 4, 2022). Defendants do not contest that the jurisdictional element of the DTSA is met.

Connolly emailed an excel sheet entitled "to do list.xlsb" (a renamed version of the file titled "GOE COA.xlsb") from his AIG email address to his personal email address for use at and by Dellwood. *Id.* ¶ 96. AIG alleges that the file contained business plans for Dellwood *and* AIG, an AIG general ledger, a list of AIG customer accounts, and a breakdown of AIG's related expenses in 2022 and 2023 that was taken from another AIG document titled "FW – AIGRM.xlsb." *Id.* ¶¶ 93-94. As another example, AIG alleges that on March 7, 2024, Connolly sent an excel file titled "To dos list.xlsx," from his AIG email address to his personal email address which contained "various components of AIG's confidential 2024 business plan" that were repurposed for use in Dellwood's startup process. *Id.* ¶ 102. AIG also alleges that Dellwood had access to business review records containing sensitive, proprietary, and confidential information regarding AIG's pricing, business initiatives and strategy, performance, and financial analysis relating specifically to AIG's E&S business. *Id.* ¶¶ 44, 132.

Courts in this district routinely find that the types of information alleged to have been taken by Connolly to Dellwood constitute trade secrets. For example, in *OWAL Inc. v. Caregility Corp.*, No. 21-13407, 2022 WL 890182, at *7 (D.N.J. Mar. 25, 2022), the court found that "financial information, business plans and strategies [and] marketing plans" contained in pitch decks was sufficient to constitute trade secrets. In *Storysoft LLC v. WebMD LLC*, No. 23-20390, 2024 WL 3771821, at *5 (D.N.J. Aug. 13, 2024), the court similarly found that that "valuable proprietary software code, details regarding the development, use and customization of [a proprietary] product, and business and marketing strategy" constituted trade secrets even though they were listed as "relatively broad categories of information" in the complaint. *See also IDT Corp. v. Unlimited Recharge, Inc.*, No. 11-4992, 2012 WL 4050298, at *6 (D.N.J. Sept. 13, 2012) (finding that a list of customers, "pricing and marketing strategies," "accounting, accounts receivable, and payment

14

records," and "market analyses" constituted trade secrets). AIG's allegations at very least "permit the defendant to ascertain at least the boundaries within which the secret lies," *Oakwood Labs.*, 999 F.3d at 906, and satisfy the notice pleading standard. *See Storysoft*, 2024 WL 3771821, at \*4 ("[A] plaintiff is not required to articulate each individual trade secret by name and description at the pleading stage.").

Dellwood also argues that AIG does not allege that the information taken by Connolly has independent economic value from being kept secret and thus does not constitute trade secrets. Mot. at 27-29. The Court disagrees. At the motion to dismiss stage, alleging that an employer protected information from disclosure by noncompete and employment agreements is sufficient to establish that the information derives independent economic value from being kept secret. *See Certainteed Ceilings Corp. v. Aiken*, No. 14-3925, 2015 WL 410029, at \*5 (E.D. Pa. Jan. 29, 2015) (finding that an allegation that an employer "protect[ed] . . . information with noncompete covenants and employment agreements" was sufficient to allege that the information was protected as a trade secret); *Pittsburgh Logistics Sys. v. LaserShip, Inc.*, No. 18-1382, 2019 WL 2443035, at \*10 (W.D. Pa. June 12, 2019) (same). Here, like the plaintiffs in *Certainteed Ceilings Corp.* and *Pittsburg Logistics Sys.*, AIG alleges that Connolly was subject to restrictive covenants including prohibitions on disclosure of the information that AIG alleged he took to Dellwood. FAC ¶ 15. Therefore, AIG adequately alleges that the information Connolly took had independent economic value from non-disclosure.

### 2.    *AIG alleges that Dellwood misappropriated trade secrets*

Dellwood argues that AIG does not allege that it misappropriated trade secrets. Mot. at 20-29. The Court disagrees. One of three independent ways to misappropriate trade secrets includes "improper acquisition." *Oakwood Labs.*, 999 F.3d at 907 (citing § 1839(5)). An improper

acquisition occurs when a trade secret of another is acquired "by a person who knows or has reason to know that the trade secret was acquired by improper means." § 1839(5)(A).

Dellwood argues that Connolly simply emailing the files at issue to himself does not mean that Dellwood acquired them. Mot. at 21.[13] However, the details surrounding the alleged conduct by Connolly leads to the reasonable inference at the motion to dismiss stage that Dellwood did in fact acquire these materials. AIG alleges that during the same time frame that Connolly sent AIG trade secrets to his personal email address, he was performing work for Dellwood while still at AIG, in advance of his official move to Dellwood. *E.g.*, FAC ¶ 92, 99. AIG further alleges that one of the same files containing AIG trade secrets that Connolly ultimately sent from his AIG email address to his personal email address contained business plans for both AIG and Dellwood; references a former EIG employee, Eric Ratti, who is now employed by Dellwood, as well as references to other Dellwood employees; and specifically references Dellwood by name. *Id.* ¶¶ 93, 95-96. AIG also alleges that a second file containing AIG's trade secrets that Connolly took includes a list of tasks related to Dellwood's business plan. *Id.* ¶ 100. Assuming these allegations are true, the circumstances are such that it is reasonable to infer, as this court must, that Connolly took these documents to Dellwood at least when he left AIG and possibly before.

These allegations are distinguishable from those in cases Dellwood cites. For example, the complaint in *Diversified Indus., Inc. v. Vinyl Trends, Inc.*, No. 13-6194, 2014 WL 1767471, at *8 (D.N.J. May 1, 2014) contained only a "bare recitation of the elements required" and "no factual detail supporting" misappropriation. Similarly, *Cotiviti, Inc. v. Deagle*, 501 F. Supp. 3d 243, 260

---

[13] The parties also argue about whether AIG adequately alleges improper disclosure and use of the trade secret. Mot. at 20-29; Opp'n at 28-32. However, the Court need not reach these arguments at this stage as it finds that AIG adequately alleges that Dellwood improperly acquired its trade secrets and such improper acquisition is an independent basis to show trade secrete misappropriation. *See* § 1839(5); *Oakwood Labs.*, 999 F.3d at 907-08, 911.

(S.D.N.Y. 2020) contained only "conclusory" allegations and lacked any allegations that trade secrets were copied or retained. And in *R.R. Donnelley & Sons v. Marino*, 505 F. Supp. 3d 194, 207 (W.D.N.Y. 2020), the complaint alleged that individuals used trade secrets but had no allegations that could lead to an inference that their subsequent employer acquired or used those trade secrets. These cases lie in stark contrast to the detailed allegations of documents containing AIG's trade secrets that specifically reference Dellwood and that Connolly allegedly took with him from AIG to Dellwood. *See supra.*

Dellwood does not directly argue that AIG fails to allege that Dellwood knowingly acquired trade secrets by improper means. However, for completeness, the Court finds that AIG has done so. "Improper means" "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." § 1839(6)(A). Here, AIG alleges that Connolly breached his duty to not disclose the information that AIG alleged he took to Dellwood. FAC ¶ 15. AIG also alleges that Dellwood knew of this restrictive covenant as Price and Driscoll were subject to the same covenants when they started Dellwood and were aware of the restrictive covenants of other AIG employees who worked form them while they were at AIG. *Id.* ¶¶ 47-48, 50, 148. Therefore, AIG adequately alleges misappropriation of trade secrets under both the DTSA and NJTSA.

### C.     AIG Fails to Allege Tortious Interference With Contracts (Count II)

Dellwood argues that AIG fails to plead interference with malice and damages as required for pleading tortious interference with contracts. Mot. at 29-32. The Court finds that AIG fails to state a claim for tortious interference with contracts because although AIG adequately alleges damages, it fails to plead interference with malice.

To allege tortious interference with contract under New Jersey law, a plaintiff must allege "(1) the existence of a protected interest; (2) interference with malice[;] (3) a reasonable likelihood

17

that the interference caused the loss of a prospective economic gain; and (4) the injury caused the damages." *Mu Sigma, Inc. v. Affine, Inc.*, No. 12-1323, No. 12-1323, 2013 WL 3772724, at *4 (D. N.J. July 17, 2013) (citing *Printing Mart-Morristown v. Sharp Electronics Corp.*, 116 N.J. 739, 751-52 (1989); *Sarmasti PLLC v. Emanuel*, No. A-1667-11T1, 2012 WL 6698722, at *3 (N.J. App. Div. Dec. 27, 2012)). The second and fourth prongs are at issue here.

As to the second prong, malice is defined as "not a general ill-will towards the victim, but as intentional interference without justification or excuse." *Id.* (citing *Printing Mart–Morristown*, 116 N.J. at 751-52). Here, AIG alleges that Dellwood was aware of the restrictive covenants at issue. FAC ¶¶ 47-48, 50, 148. However, the FAC fails to make non-conclusory allegations as to what Dellwood did to interfere with these contracts. AIG points to allegations that Dellwood "knowingly induced, encouraged and/or solicited" (a) the Former Executives to "recruit each other, as well as other AIG employees, to leave their employment in favor of new employment with Dellwood"; (b) the Former Executives to "violate their non-disclosure obligations by misappropriating and using AIG's confidential Information"; and (c) Price and Driscoll to "violate their non-competition obligations, and Driscoll's garden leave obligations." *Id.* ¶¶ 150-151, 153; *see* Opp'n at 33. However, the FAC is lacking in any factual allegations as to what Dellwood did to "induce, encourage[] and/or solicit[]" the Former Executives into these breaches.

AIG alleges that by March 7, 2024, Dellwood had hired multiple former AIG employees who worked with the Former Executives at AIG after they solicited and recruited these employees in violation of the Former Executive's non-solicitation agreements. FAC ¶¶ 77-79. However, the FAC does not allege any facts that, if true, would show that Dellwood interfered with the Former Executive's non-solicitation agreements. Dellwood does not allege that the Former Executives solicited anyone to join Dellwood who was under an obligation not to compete with AIG. The

only individuals AIG alleges were subject to non-compete agreements were Price and Driscoll—Dellwood's founders. *Id.* ¶¶ 47-49. AIG does not detail how Dellwood assisted Price and Driscoll with breaching their non-compete agreements separate and apart from Price and Driscoll's alleged underlying breaches.

AIG also makes the conclusory allegation that Dellwood "assist[ed] and induce[d]" Connolly to misappropriate its trade secrets, *id.* ¶ 89, but does not allege what actions Dellwood took, even through Price and Driscoll as its agents, that, if true, could constitute interference with Connolly's duty not to disclose the information he took.

Furthermore, there are no facts alleged that, if true, would support a finding that Dellwood interfered "*in order* to cause the breach." *Ozburn-Hessey Logistics, LLC v. 721 Logistics, LLC*, 13 F.Supp.3d 465, 478 (E.D. Pa. 2014) (emphasis in original); *see Educational Impact, Inc. v. Danielson*, No. 14-937, 2015 WL 381332, at *17 (D.N.J. Jan. 28, 2015) ("[E]ven assuming [the new employer] was aware of the exclusive contract, the Amended Complaint fails to present any facts that tend to show that [the new employer] acted with the purpose of interfering with [the former employee's] relationship with [the former employer], though that may have been a consequence of [the former employee's] new relationship with [the new employer].").

Dellwood also argues that AIG does not adequately allege damages. However, the tortious interference claim is based, at least in part, on Dellwood's alleged misappropriation of AIG's trade secretes obtained through Connolly. *See* FAC ¶ 145. As the Court noted above, alleging trade secret misappropriation itself alleges harm to the plaintiff. *See Oakwood Labs.*, 999 F.3d at 913-14 ("[C]ognizable harm is pled when a plaintiff adequately alleges the existence of a trade secret and its misappropriation."). As the Court has found that AIG adequately alleges trade secret misappropriation, it also finds that Dellwood has alleged damages associated with the underlying

breaches of contract prohibiting Connolly from disclosing the trade secrets to Dellwood.  However, because AIG does not adequately plead interference with malice, the Court will **DISMISS** Count II *without prejudice*.[14]

### D.  AIG Fails to Allege Aiding and Abetting Breach of Fiduciary Duty (Count III)

Dellwood argues that AIG fails to state a claim for aiding and abetting breach of fiduciary duty because the FAC does not allege that Dellwood provided "substantial assistance to the primary violator."  Mot. at 33-34.  The Court agrees.

To state a claim for aiding and abetting breach of fiduciary duty under both New Jersey and Delaware law, a plaintiff must allege (1) a breach of fiduciary duty, (2) knowledge of and substantial assistance in that breach, and (3) damages.  *See Wiatt v. Winston & Strawn LLP*, 838 F. Supp. 2d 296, 307 (D.N.J. 2012) (New Jersey Law); *Atlantic NWI, LLC v. Carlyle Grp. Inc.*, No. 2021-0944-SG, 2022 WL 15800272, at *6 (Del. Ch. Oct. 28, 2022) (Delaware Law); *In re Cred Inc.*, 650 B.R. 803, 828 (Bankr. D. Del. 2023) (Delaware Law).[15]  "Substantial assistance, 'by definition, implies active participation or affirmative action.'"  *In re Cred Inc.*, 650 B.R. at 828

---

[14] In a footnote, Dellwood asserts that AIG PC Global Services, Inc. lacks standing to assert a tortious interference claim.  Mot. at 32 n.33.  Dellwood has waived this argument by not developing it properly as an argument in its brief.  If AIG pursues Count II in an amended complaint and Dellwood wishes to litigate this issue, it must do so in the body of its brief—a "passing reference to an issue . . . will not suffice to bring that issue before this court."  *Laborers' Intern. Union of N. Am., AFL–CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) (citations omitted).

[15] The parties do not take a position on whether New Jersey or Delaware law governs and cite both sources of law.  However, as Dellwood points out, a choice of law analysis is unnecessary at this stage as Dellwood only challenges AIG's allegations of its assistance with the underlying breach which is a common element under both New Jersey and Delaware law.  Mot. at 33 n.35.  The Court notes that all elements appear the same under both New Jersey and Delaware law in all material respects.  New Jersey law requires "knowledge of and substantial assistance" in the underlying breach, *Wiatt*, 838 F. Supp. 2d at 307, and Delaware law requires "knowing[] participat[ion]" in the underlying breach, *Atlantic NWI, LLC*, 2022 WL 15800272, at *6.  The Court does not find a meaningful distinction between the two.

(quoting *In re DSI Renal Holdings, LLC*, Nos. 11-11722, 14-50356, 2020 WL 7054390, at *6 (Bankr. D. Del. Dec. 2, 2020).

Count III suffers from the same deficiency as Count II. AIG points to allegations that Dellwood "induced" Connolly to steal trade secrets from AIG and that it "worked with" the Former Executives to violate their non-compete agreements and that the Former Executives "solicited" AIG executives. Opp'n at 36 (citing FAC ¶¶ 11, 19, 159-163, 170). However, for the same reasons as discussed *supra* Section III (C), these conclusory allegations do not contain any facts that show actions that Dellwood took, either itself or through the Former Executives as its agents. AIG is correct that it need not provide *proof* of Dellwood's assistance at the pleading stage, Opp'n at 36, but it must offer more than mere conclusions. *See In re Cred Inc.*, 650 B.R. at 829. Therefore, the Court will **DISMISS** Count III ***without prejudice***.

### E.    AIG Adequately Alleges Unfair Competition (Count IV)

Dellwood argues that AIG fails to allege an unfair competition claim because (a) AIG fails to allege that Dellwood misappropriated its trade secrets and (b) AIG fails to allege that Dellwood acted with "bad faith." Mot. at 34-38. The Court disagrees.

Dellwood's first argument fails because the Court has held that AIG adequately alleges misappropriation of trade secrets. *Supra*, Section III(B); *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 386-87 (3d Cir. 2016) (finding that a claim for unfair competition encompasses, *inter alia*, claims for misappropriation of trade secrets).

As to Dellwood's second argument, to the extent some form of "bad faith" is required to state a claim for unfair competition,[16] the Court has already found that AIG alleges that Dellwood

---

[16] It is not clear that "bad faith" is the correct term to use to describe the knowledge or intent requirement in an unfair competition claim. The claim is "amorphous" in nature and the "standard of liability" is "somewhat adaptable." *Avaya Inc., RP*, 838 F.3d at 386 (cleaned up). "[T]he

acquired AIG's trade secrets from Connolly despite being aware of Connolly's duty not to disclose AIG's trade secrets and confidential information. *Supra*, Section III(B). This conduct, if true, implicates the "business fairness" and "ethical standards" at issue in an unfair competition claim. *Avaya Inc., RP*, 838 F.3d at 386. Therefore, the Court finds that AIG states a claim for unfair competition.[17]

### F.    AIG Fails to Allege a CFAA Violation (Count V)

Dellwood argues that AIG does not state a claim under the CFAA because it does not allege the requisite loss or unauthorized access. Mot. at 38-40. The Court finds that AIG fails to allege that Dellwood accessed AIG's computers in violation of the CFAA.

While the majority of CFAA actions involve "classic hacking activities," "the scope of its reach has been expanded over the last two decades" and "[e]mployers . . . are increasingly taking advantage of the CFAA's civil remedies to sue former employees and their new companies who seek a competitive edge through wrongful use of information from the former employer's computer system." *P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 510 (3d Cir.2005) (cleaned up).

The provisions relevant to AIG's claim impose liability against whoever:

(2) intentionally access a computer without authorization or exceeds authorized access, and thereby obtains
    (C) information from any protected computer
    [or] . . .

---

purpose of the law regarding unfair competition is to promote higher ethical standards in the business world." *Id.* (cleaned up).

[17]In a footnote, Dellwood asserts that AIG's unfair competition claim is duplicative of its misappropriation of trade secrets claim. Mot. at 29 n.28. Dellwood waives this argument as it was merely raised in passing in a footnote. *See Laborers' Intern. Union of N. Am., AFL–CIO*, 26 F.3d at 398. Even if it were not waived, "[a]n unfair competition claim . . . protects more information than a traditional trade secret claim." *Avaya Inc., RP*, 838 F.3d at 387. At the motion to dismiss stage, the Court cannot "dispense with the possibility that [an unfair competition claim] arguably encompass[es] more conduct than the misappropriation claim[]." *Baxter Healthcare Corp. v. HQ Specialty Pharma Corp.*, 157 F. Supp. 3d 407, 426 (D.N.J. 2016).

(5)    (A) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer;

(B) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or

(C) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss.

18 U.S.C. §§ 1030(a)(2)(C), 1030(a)(5)(A)-(C).  To state a civil claim for violating the CFAA, a plaintiff must allege "(1) damage or loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value; (2) caused by; (3) violation of one of the substantive provisions of §§ 1030(a) or (b)."  *Advanced Fluid Sys., Inc. v. Huber*, 28 F. Supp. 3d 306, 326 (M.D. Pa. 2014) (cleaned up); *see* 18 U.S.C. §§ 1030(c)(4)(A)(i)(I), 1030(g).

Here, the FAC is devoid of any factual allegations that, if true, would establish that Dellwood accessed AIG's computers.  "[A]ccess" can include the "act of inducing another to access a protected computer that he or she is otherwise not authorized to use."  *Advanced Fluid Sys.*, 28 F. Supp. 3d at 327 (collecting cases).  However, the FAC does not allege facts that show Dellwood induced Connolly to do so.  Conclusory statements that Dellwood "utilized" or "induced" Connolly to access AIG's computers for Dellwood while Connolly was at AIG are insufficient to withstand a motion to dismiss.  FAC ¶¶ 86, 198; *see Twombly*, 550 U.S. at 555; *c.f. Advanced Fluid Sys.*, 28 F. Supp. 3d at 327 (finding that a complaint adequately alleged that a defendant company "accessed" protected computers when it "installed a VPN profile on [a] protected computer which allowed [a current employee] to initiate a 'point-to-point connection' between the protected computer and [the defendant company's] network").

Moreover, even if Connolly's actions could be attributed to Dellwood, the FAC does not adequately allege that Connolly was without authorization to access AIG's computers or exceeded

his authorization in doing so.  "'Exceeds authorize access' means obtaining information beyond what was authorized.  It does not go to the improper use of the information validly accessed . . . . Thus, an employee who misuses information she was authorized to obtain cannot be held liable." *Teva Pharms. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 670 (E.D. Pa. 2018).  Here, AIG alleges that it prohibited Connolly from sending information from the AIG computer systems to his personal email account, FAC ¶ 128, but does not allege that Connolly used his access to obtain information that fell beyond his access.  *See WEC Carolina Energy Solutions LLC v. Miller*, 687 F.3d 199, 207 (4th Cir. 2012) (finding that plaintiff failed to state a CFAA claim where an employee emailed confidential documents he had downloaded to his personal account before resigning from the company to work for a competitor).  Therefore, the Court will **DISMISS** Count V *without prejudice*.[18]

## IV.    CONCLUSION

For the foregoing reasons, the Court will **GRANT in part** and **DENY in part** the Motion. The Court will **DISMISS** *without prejudice* Counts II, III, and V.  Counts I and IV will **PROCEED**.  Plaintiffs will have **30 days** to file an amended complaint to attempt to cure the deficiencies addressed herein should they wish to pursue Counts II, III, and V.  An appropriate Order accompanies this Opinion.


Dated: March 28, 2025

Evelyn Padin, U.S.D.J.

---

[18] Because the Court finds that AIG does not adequately allege that Dellwood accessed its protected computers, it need not reach Dellwood's argument that AIG has not alleged the requisite loss to state a CFAA claim.